IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SURENDER MALHAN | ) | |
| | ) | |
| | ) | No. _____ |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID KATZ, and GURBIR | ) | |
| S. GREWAL, in his official capacity | ) | |
| as Attorney General of New Jersey, | ) | |
| PHIL MURPHY, in his official | ) | |
| capacity as Governor of New Jersey, | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED COMPLAINT**

<u>Jurisdiction</u>

1.     This Court has jurisdiction over this matter under 28 U.S.C. §1331. Plaintiff maintains this action under 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201.   Defendants are depriving Plaintiff of liberty (free speech, freedom of association, right to privacy and freedom of the press) under color of law by several "gag orders" prohibiting plaintiff from discussing ongoing litigation of a civil rights lawsuits pending in federal and state courts, and from various restrictions on Malhan's movement and association.

<u>Summary</u>

2.     This is an action pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, to enjoin enforcement of various "gag orders" imposed by the State of New Jersey, that, if allowed to continue in effect, would impose an intolerable burden on speech and on the press and freedom of association, in violation of the First and Fourteenth Amendments and of the United States'

1

Constitution.

3.    Plaintiff seeks prospective declaratory and injunctive relief against enforcement of gag orders issued by the State of New Jersey, Ordering a father not to discuss any matter involving custody with any member of the press, as well as enjoining the father from posting anything on social media related to his children or custody, and on numerous Gag Orders stating Malhan may not speek with any employee of any private high school, and may not speak with his childrens' therapists.   Copies of the Gag Orders are attached hereto as Exhibits 1-5.   The Gag Orders were entered without a plenary hearing or any weighing of competing interests.

<u>Parties</u>

4.    David Katz is a judicial officer of the State of New Jersey, Essex County Superior Court, Family Division.   He is sued in his official and individual capacities under the doctrine of *Ex parte Young* to halt the ongoing violation of fundamental constitutional rights. *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645-46 (2002); *Balgowan v. State of N.J.*, 115 F.3d 214, 219 (3d Cir. 1997).

5.    Attorney General Gurbir Grewal is the official charged with defending the constitutionality of state action and state laws; he is sued in his official capacity to challenge State action.

6.    Attorney General Gurbir Grewal has the power and authority under New Jersey law to enter into a content order in this a case agreeing that the practices and policies at issue are unconstitutional and thus has power and authority to correct the violations at issue here.

7.    Governor Philip Dunton Murphy, is the chief law enforcement officer of New Jersey with power to enforce or decline to enforce restraining orders.

<u>Statement of Facts</u>

Facts Relevant to Sivilli/Kessler/Katz Gag Orders

8.      On February 24, 2011, approximately one month after receiving her permanent resident "Green Card,"Alina Myronova, the putative wife of Surender Malhan, filed an Order to Show Cause in Hudson County Family Court asking that full physical and legal custody of the children be given to her and all custody stripped from her husband Surender Malhan.

9.      In seeking and obtaining full legal custody (in order to maximize her child support) Myronova made a variety of allegations against Malhan stating that in her opinion he was detached from reality and unable to care for himself and others.

10.     Malhan had less than two hours' notice of a legal proceeding and had no time to seek legal advice or obtain counsel.

11.     Malhan, appearing before the family part judge, contested all of Myronova's allegations about his alleged unfitness as a parent.   Malhan stated that Myronova was lying.   Malhan was not permitted to cross examine Myronova.

12.     Malhan told the court that he wished to present evidence to refute the allegations made by Myronova, but the court did not permit Malhan to present any evidence at this proceeding.

13.     On February 24, 2011, the Court stripped Malhan of physical and legal custody ordering Myronova to have full legal custody of the two children.

14.     Based on Myronova unsubstantiated and false allegations, the family court demanded that Malhan see a psychologist.

15.     Malhan in the Spring of 2011 consulted three psychologists or psychiatrists; All three cleared him of any problems.

16.     In March 2011 Malhan was evaluated by Dr. Jada Turco, M.D who cleared Malhan of any mental problems.

17.     The Turco report was provided to the family court.

18.    In March 2011 Malhan was extensively evaluated by Dr. Leonie Johnson-Sena, MD.

19.    Dr. Sena prepared an extensive eight page single spaced report to the Court concluding: "Mr. Malhan does not present with any psychiatric symptoms."

20.    For the first month (March 2011) Malhan was only permitted to have supervised contact with his two small children in the courthouse.

21.    Myronova tried to prevent Malhan from having any unsupervised visitation insisting he was mentally ill.

22.    The Family Court, however, Ordered that Malhan have unsupervised visitation (two hours per day) ruling:

> THE COURT: The supervised visitation shows he's doing Fine, he has no problem, he brings food for the children, he appropriately plays with the children .   … It doesn't have to be supervised, the man is not a risk to his children.
> 4/1/2011 Tr. 55.

23.    Despite the above ruling, the court indicated it would like to see additional evaluations of Malhan.

24.     In April 2011, Malhan also consulted extensively with psychologist Dr. Lidia Abrams who concurred with Doctors Turco and Sena and who presented a thorough 6-page single spaced report to court finding a lack of mental problems.

25.    In April 2011 the Court appointed psychologist Dr. Marcy Pasternak, Ph.D to conduct an evaluation of all parties.

26.    Dr. Pasternak's report did not identify any psychological problems with Mr. Malhan and concluded that he was a good parent.

27.    In July 2012, the Court finally ordered that Malhan would have legal custody again with overnights 4 days a week on weekdays.

28.    The court criticized Myronova for insisting for the prior sixteen months that Malhan was not a fit parent:

> THE COURT: I -- I don't understand your client's [Myronova's] position with all

due respect, sir. And I don't mean to put you in the spot. She has vehemently addressed the fact that Mr. Malhan cannot have overnight visits with these children because of his sleep deprivation issues, because of his work issues . And she has consistently banged the table, if you will, that this cannot take place.   … Why are we even having all of this? What a waste.

July 3, 2012 Trans. at 15-16.

29.   In August the family court commented further on this issue stating:

THE COURT: And nothing changed on Mr. Malhan's behalf from January of 2010  --maybe it was 2011, until now. Nothing changed for him. His life didn't change. His mental acuity didn't get any better or any worse. He's the same person who came in front of me January of 2011.

Tr. Aug 24, 2012 30-31.

30.   Malhan has long been an active "blogger" and for years has published regular updates on his annulment suit involving the fraudulent "marriage" to his putative wife Alina Myronova.

31.   In 2012 Malhan posted online an extensive discussion of his marriage fraud case describing how his putative wife had committed fraud and stolen over $300,000 from marital assets and his business.

32.   In late 2013, Malhan asked Dr. Lidia Abrams to perform an independent custody evaluation to supplement the report of Dr. Pasternak.

33.   Dr. Abrams met with the two children for the first time in January 2014, which began a long and extensive series of contacts with the children and their parents for the next several years.

34.   In February 2014 Malhan and five other named plaintiffs filed a class action law suit against the State of New Jersey alleging widespread violation of the due process rights of parents in New Jersey, in particular that the State deprives parents of custody of their children without a plenary hearing when the state gives custody to another parent.   Edelglass, et al, v. New Jersey, et al, No. 3:14-cv- 760.

35.   The federal suit was based upon the fact, in Malhan's case, that he had lost

legal custody for sixteen months based on false innuendo claiming he was mentally unable to take care of children.

36.     On April 4, 2014, the Defendants Judge Nancy Sivilli and Essex County Superior Court, Family Part issued a "gag order" retraining Malhan from discussing any issues surrounding the divorce or custody proceedings with any employee of any media anywhere in the universe and further restrained Malhan from posting anything on the internet discussing "custody."

37.     The Gag Order also required Malhan to remove specific parts of a posting on his website that criticized the Superior Court and the presiding judge by name—parts of this "objectionable" post had been available on line for over a year.

38.     The Court did not hold a plenary hearing and made no findings whatsoever specific to Malhan or his children.   The Court "found" generally that publicity about divorce proceedings was not in the best interests of children.

39.     On May 1, 2014 the Judge Sivilli and Essex County Superior Court issued an Amended Order, slightly modifying the April 4 Gag Order.   A Copy of this Order is attached as Exhibit 2 to this Complaint.

40.     On or about May 6, 2014, Malhan brought suit in federal court seeking to have the Gag Order declared unconstitutional and also filed an application for a TRO to enjoin enforcement of the gag order, but it was denied on Rooker-Feldman grounds without reaching the merits.

41.     Malhan's application for interlocutory review of the Gag Order by the Appellate Division of New Jersey was denied also.

42.     In June 2014, Bergen Dispatch Reporter Paul Nichols brought suit in New Jersey Federal District Court to enjoin enforcement of the Gag Order, arguing that the Gag Order was preventing him from interviewing Malhan.

43.     Largely as result of this Gag Order Malhan's case has achieved national attention and there are currently hundreds of websites discussing his legal battles including details of the marriage fraud and Malhan's loss of custody.

44.     Judge Sivilli made a motion to Dismiss, which was denied by the Court per Judge Martini in December 2014.

45.     Specifically the District Court ruled (inter alia):

> The *Dow Jones & Co. Court*, which found that a similar gag order was not a prior restraint on the press, upheld the order only after concluding that it was justified. First, the court noted that the judge who issued the gag order examined specific circumstances unique to the case. For example, the judge found that press leaks attributable to the government revealed the identities and testimony of grand jury witnesses, which constituted a "shameful abuse of grand jury secrecy" that jeopardized the Sixth Amendment rights of the criminal defendants. Moreover, the judge issuing the gag order "properly recognized [that] before entering an injunction against speech he had to explore whether other available remedies would effectively mitigate the prejudicial publicity." Dow Jones & Co., 842 F.2d at 609, 612 (citing Nebraska Press, 427 U.S. at 562).
>
> According to the SAC [Second Amended Complaint], Judge Sivilli did not engage in this type of analysis before issuing the Gag Order. The Gag Order – which is attached to the SAC – broadly prohibits Malhan from discussing any aspect of his divorce, including his experiences during child custody proceedings. (SAC at ¶ 17). The SAC alleges that despite its far-reaching scope, the Gag Order was issued "in a summary proceeding without any evidentiary hearing or any weighing of competing interests…." (SAC at ¶ 26). The SAC further alleges that Judge Sivilli made no specific findings regarding Mr. Malhan and his children with respect to the need for a gag order, and instead issued the Order "based on a generalized finding that publicity in family court is not in the best interests of children." (SAC at ¶¶ 18, 26). The Court therefore rejects Defendants' argument that Nichols has failed to adequately allege a First Amendment violation.

Nichols v. Sivilli, CIV. 2:14-3821 WJM, 2014 WL 7332020, at *6 (D.N.J. Dec. 19, 2014).

46.     A few weeks after the Judge Martini decision, and in order to comply with the disitrct court decision that Judge Sivilli recognized as a declaratory decree, on January 25, 2015 Judge Sivilli scheduled "an evidentiary hearing to weigh the

competing interests of the best interests of the parties' children and defendant's First Amendment rights."

47.     However, three days later Judge Sivilli cancelled the plenary hearing, and recused herself from further participation. For several months no judge was actively assigned to the case; and during this interregnum period the Gag Order was never vacated.

48.     Judge Sivilli was eventually succeeded by Judge Donald Kessler.

49.     On May 29, 2015 Judge Kessler scheduled a plenary hearing to permit Myronova to present evidence to support the issuance of a Gag Order, which was part of what the federal District Court, per Judge Martini had stated was required before issuance of a Gag Order—Judge Kessler explicitly acknowledged on the record that he needed to follow the ruling of the Federal District court.

50.     The May 29, 2015 Kessler Order stated:

> 1. This matter shall be scheduled for a hearing on June 18, 2015 at 9:00a.m. to address the pending issue of the gag order and hold a plenary hearing on any aspect of the pending issue, if necessary.
> 2. Defendant shall submit his position including the legal basis therefore and relevant documents on or before June 3, 2015.
> 3. Plaintiff shall submit her reply to the legal position and any relevant documents on or before June 10, 2015.
> 4. The parties shall, by June 10, 2015 provide a list of any witnesses whom testimony they claim is required at the hearing with a summary of the witness testimony.

51.     On June 18, 2015, however, Myronova failed to present any witnesses or any evidence, nor did Myronova submit any briefing or any documents to the Court.

52.     Judge Kessler stated on the record, June 18, 2015:

> The change that we have since Judge Sivilli entered her order is that we have the orders -- the -- the ruling by Judge Martini**, and the essence of Judge Martini's decision, as I understand it, is that the court needs to hold a plenary hearing <u>before</u> it can have an enforceable gag order**. So that -- and that was what I tried to join for today.

53.    Judge Kessler then stated that he was inclined to give Myronova yet more time to try to justify the Gag Order, stating:   "So now I am at a point where I have to schedule a further plenary hearing."

54.    No plenary hearing was ever re-scheduled or held.

55.    Judge Kessler did not explain why he would sua sponte permit more time (Myronova did not even request a continuance and appeared willing to let the whole issue drop).

56.    Malhan asked that the Gag Order be vacated entirely as Myronova had failed to present any evidence for a Gag Order.

57.    Judge Kessler stated sua sponte that he was not going to vacate the order entirely but he was sua sponte issuing a slightly more narrow gag order, even without a plenary hearing:

>    Just so everyone knows that at this point time, I am going to limit the gag order, and what I'm going to limit it to because I haven't seen – I haven't presented with anything else that tells me I shouldn't limit it, and I agree that it's plaintiff's burden of proof, but I still have to mindful that if I have a statutory obligation as a judge, I have to -- you know -- I've got to respect that statutory obligation. So that's really -- and I recognize that there -- I can deviate if there's a proper record, but there would have to be a proper record. So my inclination is to limit the gag order only to disseminating information or discussing the -- the substance of the custody issues. …
>    Anyone who wants to discuss what happened in the courtroom, that's free speech. Someone wants to discuss how I've handled the hearing, this is open to the public; I'm not exempt from that or immune from it, and I'm not trying -- so I understand that -- you know -- I'm not limiting any comment or criticism on the due process aspects of this, how the court approaches their (indiscernible).

58.    The basis for the Gag Order according to Judge Kessler was supposedly to prevent Malhan for revealing information contained in DCPP reports:

THE COURT: I do think it's [the Gag Order] over-broad, but I am only going to have one restraint at this point in time and I'll hear from [Myronova's Counsel] on this.

MR. CLARK: Okay, yeah. I mean if the order is limited to not revealing the DCPP reports --

THE COURT: Well, it's more than that. **You can't really discuss the custody issues and – because how do you draw the line -- you know -- how does a litigant who's not a lawyer really appreciate where the line -- between what the DCPP has decided and what the other custody issues are**.

59.   DCPP reports are confidential by statute and Malhan was not contesting that statute but objected to any Gag Order that went beyond limiting dissemination of information from DCPP:

THE COURT: I understand that there is a need for a plenary hearing.

…

MR. CLARK: Right. The only thing I would just add again with respect to the gag order is, again, the burden is on them to show the need for a gag order until at least certainly this wide-spread gag order that goes beyond the statutory things with the DCPP.   …

THE COURT: Well, I'm not going to vacate it in its entirety … because I already have a confidentiality order about the DCPP.

MR. CLARK: And again, we're not -- right.

THE COURT: So -- and then the question is where do you draw the line, and that is a significant issue to me.

60.   As of June 2015 there was already a confidentiality order in place regarding DCPP to which Malhan had not objected, but this DCPP confidentiality Order merely prevented litigants from revealing information obtained from confidential DCPP reports

61.   As of June 2015 there was a large volume of information post by Malhan online related to his case and "custody" that Myronova demanded Judge Kessler order to be removed but Judge Kessler allowed all existing information to remain.

62.   Judge Kessler then signed a new Gag Order providing:

It is on this 18th day of June 2015 hereby ORDERED:

1. All parties are hereby restrained and enjoined from speaking with, appearing for an interview, or otherwise discussing any custody information to any reporters, journalists, newscasters or other news media employees or from posting any blogs or information not previously posted or disseminated relating to the children or any custody issue in this case pending a further hearing. Judge Sivilli's Gag Orders dated April 4, 2014 and May 1, 2014 are hereby vacated except as set forth above.

63.    A partially redacted copy of the court Order is attached hereto as Exhibit 1.

64.    The Court Order did not further specify the meaning of "custody issue" Malhan was not to discuss with news media.

65.    As can be seen from the above language, Malhan was also broadly restrained from posting any blogs or information on-line "relating to the children or any custody issue in this case."

66.    The Court, per Judge Kessler, did NOT explore whether other available remedies would effectively mitigate the prejudicial publicity, or even discuss what pre-trial publicity was of concern, or why.

67.    As of June 2015 Malhan already had posted extensively on the internet describing the scam perpetrated on him by his putative wife and how she had been misusing the family court system—many (if not all) of these posts remain accessable in 2020.

68.    In addition to Malhan's posts, numerous other websites have discussed his litigation and the marriage fraud and legalized kidnapping perpetrated by his wife.

69.    Also in 2015, the Court per Judge Kessler ordered Malhan to consult with and pay Dr. Ralph Fretz to evaluate the situation (including the effect of publicity on the children), however, after Malhan had paid Dr. Fretz thousands of dollars, Dr. Fretz announced he was retiring to Florida and he never completed his report.

70.    Also in 2015 or 2016, DCPP hired Dr. Robert Kanen to do an evaluation of the various family members and related parties, but Dr. Kanen did not find any significant issues with Malhan.

71.    In December 2015, Judge Kessler still refused to vacate the Gag Order but offered further discussion of why he was failing to vacate it, writing:

> On June 18, 2015, the Court held a hearing regarding the gag orders. Plaintiff, who had the burden of persuasion, failed to present any evidence in support of gag orders. For that reason, the Court vacated the substantial portion of the gag orders dated April 4, 2014 and May l, 2014. However, this Court determined based on the information then known to it that the parties should not discuss the custody proceedings with the media for the following reasons. Since the inception of its assignment of this case, this Court had been presented with materials from the DCPP, shared with counsel and the parties, suggesting that the children were being emotionally abused by being placed in the middle of the parties' acrimonious relationship…. The Court was concerned that the parties would not be able to draw the line between matters that came to their attention in DCPP proceedings and custody matters only relating to the divorce case. The inability of the parties to draw the line between confidential DCPP matters and other custody matters was exacerbated by the acrimony and highly contentious nature of the divorce proceedings. The Court was concerned that public interviews of the parties would adversely affect the children, who were reportedly emotionally traumatized.

72.    Malhan has never posted anything from any of the confidential DCCP reports.

73.    The family court's primary reason for issuing a Gag Order was that: "The Court was concerned that the parties would not be able to draw the line between matters that came to their attention in DCPP proceedings and custody matters only relating to the divorce case"—according to this explanation the Gag Order is facially overbroad.

74.    DCPP reports are protected by State law and Malhan has never challenged this provision to not make public confidential DCPP reports, but the family court prohibited Malhan from broadly discussing custody issues because he might mention something he should not—this is a prior restraint not allowed under the Constitution.

75.    The Judge Kessler explanation from December went on to state:

> Accordingly, this Court ordered a restraint on the parties from dissemination of information to the media or posting blogs or otherwise disseminating any information relating to the children and custody matters pending an evaluation by a psychologist of the harm to the children by publicity and whether the parties could draw the line between disclosure of confidential DCPP matters and other custody matters.

76.    In the five years that this Gag Order has been in effect Malhan has never made public confidential DCPP reports.

77.    In the five years that this Gag Order has been in effect, Malhan has never been accused of posting any confidential DCPP reports to the internet.

78.    Malhan personally does not even have copies of confidential DCPP reports.

79.    If the family court wanted to see whether the parties could draw the line between disclosure of confidential DCPP matters and other custody matters it has many years of record in which Malhan has not revealed any DCPP reports, but despite Malhan repeatedly filing motions to vacate the Gag it remains in effect.

80.    Even if the State had an interest in protecting DCPP reports the Gag Order has always been substantially overbroad, and despite claiming to be temporary remains in effect six years later with no end in sight.

81.    As to Judge Kessler's expressed concern (without any admissible evidence) that "public interviews of the parties would adversely affect the children, who were reportedly emotionally traumatized" in June 2019 Myronova's own expert opined that "Neither child presently appears to be experiencing any adverse effects by any publicity in this case."   Page 21 of unadmitted Dasher report dated June 21, 2019. Yet the Gag Order remains in effect.

82.    After Judge Kessler replaced Judge Sivilli and issued the new gag order, Reporter Paul Nichols sought leave to amend his complaint to add Judge Kessler as the new defendant in place of Judge Sivilli.

83.    The New Jersey Attorney General's Office represented all of the judges and opposed the motion.

84.    Although it took the Court some time to issue a ruling, in June 2016 the federal court per Judge Martini issued a decision granting Nichols motion to add Judge Kessler as a party.

85.    Of particular interest the federal district court decision stated:

> While Malhan has indicated that he does not intend to discuss the "minutia" of his custody issues with the press, he has never expressed an outright unwillingness to offer public comments on broader custody-related topics, including his distrust of the family court system.    To the contrary, the series of gag orders that have been the subject of this litigation were entered in direct response to Malhan discussing those issues with members of the press. This is pertinent because Judge Kessler's gag order does not prohibit discussions that concern "the minutia" of custody issues; instead, it plainly prohibits *any* discussions with the media that concern custody, period. Moreover, while Malhan may not currently plan to mount his own challenge to the new gag order, it does not necessarily follow that he would continue to refrain from speaking with the press if the gag order were vacated.

Nichols v. Sivilli, 2:14-3821 (WJM), 2016 WL 3388296, at *4 (D.N.J. June 14, 2016) (emphasis original).

86.    A few days after the above decision was handed down, Paul Nichols died suddenly.

87.    None of Nichols's business associates or heirs was interested in pursuing the litigation in Nichols's place so the Amended Complaint was never filed and the case was closed a few months later.

88.    On February 24, 2017 Judge Kessler ordered that instead of having one expert opine on the effects of publicity that each party was to retain its own expert to opine on the effects of publicity—the Gag Order remained in effect.

89.    The February 24, 2017 Order requited that an expert report on the effects of publicity be completed within 90 days, however, Myronova failed to produce or

submit a report—but the Gag Order remained in effect.

90.     Myronova identified an expert pursuant to the February 24, 2017 Order however she fired her expert without having him submit a report.

91.     Myronova then hired new expert, Paul Dasher and asked the court to delay trial while her new expert worked on a report.

92.     Ultimately in June 2019 Dasher finished a report that was provide to Mahan but has never been entered into evidence in the family case.

93.     The Dasher report contained a single, short paragraph (less than eight lines of text) discussing publicity and concluded: "Neither child presently appears to be experiencing any adverse affects by any publicity in this case."   Page 21 of unadmitted Dasher report dated June 21, 2019.

94.     After nine years of publicity in Malhan's case, Myronova's own expert concluded "Neither child presently appears to be experiencing any adverse affects by any publicity in this case."

95.     As of June 2019 there were hundreds of websites that discussed Malhan's legal case.

96.     Neither child has ever experienced any adverse effects from publicity going back over ten years.

**Gag Order Extended to Discussions with Malhan's own Children**

97.     The family court has several times ordered that neither parent shall "disparage" the other to the children, however, when both parties shared custody this order, although unconstitutional restraint on speech had little practical effect because the children could see for themselves that allegations against Malhan were false.

98.     For example, Myronova would routinely tell the children that Malhan was mentally ill and was a criminal who would be going to jail; but when the children lived with him four days a week they could see these assertions were nonsense.

99.     After September 2017 Malhan has rarely seen the children and has not been

permitted any private conversations and when he has been permitted to see the children at all it was only in a closely monitored supervised setting. Effective January 2020 Malhan has not been permitted to see his children at all.

100.   The result of this separation has been that Myronova has been free to lie about Malhan every day of the year for two and a half years, since September 2017.

101.   Moreover, in 2018 the Court per Judge Kessler even expanded that Order and Ordered that Malhan was not permitted to discuss any aspect of the legal case with the children.

102.   This Order was actually entered after numerous sources confirmed that Myronova was making false and disparaging comments about Malhan to the children that was damaging their relationship with their father; the court per Judge Kessler ruled on February 8, 2018:

> I was concerned when this came to me about what was causing problems with the pick-ups and drop-offs. And I have -- the -- the recent Peaceful Healing report that I received indicated on -- that during the intake process, Ms. Myronova discussed the circumstances with Mr. Malhan (sic) in front of the children and, as according the report, she made it clear that his emotional status was interfering with his judgement and decision-making. … Ms. Myronova was making negative statements about Mr. Malhan in front of the children and that Mr. -- that Rothstein [Myronova's live-in boyfriend] was laughing about it. All of which, at least in my view when I look at this in totality, was creating the atmosphere in which the children would be unwilling to make the transfer ….   I was hoping as to what was causing the problems with the pick-ups and the drop-offs. So it's my inclination at this time to resume the -- the – the parenting time … I also want to express concern from all the various reports that I've gotten recently and also from my prior experience in this case, it has become abundantly clear that both parties are putting the children squarely in the middle of this divorce case.   This has to stop. You know, in my last order I indicated that there wouldn't be any disparaging comments about the other party in the presence of the children, but I -- I'm going to underscore that today.   Give -- this is a very toxic environment for these children. It's only going to get

16

worse. It's not going to get better. And my concern is that unless I resume parenting time, Mr. Malhan's relationship is going to be further alienated.

103.   The Court may have thought it was trying to help Malhan, but the Gag Order on conversations with his children had the opposite effect.

104.   First, even though the Court per Judge Kessler on February 8, 2018 Ordered that Malhan's unsupervised custody would resume, Myronova refused to comply and Judge Kessler and then Judge Katz refused to sanction her.

105.   As a result, all of Malhan's contact with his children was supervised while none of Myronova's was, and her poisoning of the children continued on a daily basis.

106.   During the occasional supervised visits (which stopped entirely in January 2020) the children would often bring up the ongoing divorce/annulment case, for example, one time at a supervised visit in the courthouse in 2019 the children asked Malhan why he was prolonging the litigation.

107.   Malhan was not able to respond and deny this false allegation without risking being held in contempt of court and the supervised visit being ended immediately.

108.   Accordingly, the effect of the interfamily Gag Order forbidding Malhan to discuss the case is simply to allow Myronova to tell lies about Malhan and Malhan is not permitted to respond at all.

109.   During this entire time that the children were living with Malhan four days per week from 2012 to 2017 Myronova constantly made false allegations against Malhan to attempt to make him lose custody of his children in order to maximize her receipt of "child support."

110.   In June of 2016 she filed a false "domestic violence" complaint against Malhan.   FV-09-2768-16.

111.   In the FV case she asked the judge in that court to give her full legal custody

17

but the court refused.

112.   After a 9-day trial on the domestic violence assertion, the Court ruled in Malhan's favor concluding: "the court finds plaintiff [Myronova] to be highly incredible."

113.   The FV court hearing the case further found that "defendant [Malhan] was very much concerned about the children's health, safety, and overall well-being."

114.   Under New Jersey, and federal law as well, the FV case is res judicata and results in issue and claim prelusion as to claims and issues litigated between Myronova and Malhan.    J.F. v. B.K., 308 N.J. Super. 387 (N.J. Super. App. Div. 1998) ("Plaintiff's prior complaint alleging some or all of the prior acts which the court found to constitute acts of domestic violence was dismissed after a hearing. Therefore, even if those acts had been alleged in the present complaint, plaintiff would be precluded under principles of res judicata and collateral estoppel from relitigating allegations which had been decided adversely to her in the earlier hearing.")

115.   Myronova's loss in the FV case did not deter her, and in early 2017 yet again she made false allegations that Malhan was "stalking her."   HUD-16-4504.

116.   All charges were later dismissed, but not before Malhan was arrested in front of his children and taken to jail in April 2017 while on vacation with his children at West Point, NY.

117.   The jail, per Christian Medina, did a suicide evaluation of Malhan (as is common practice) and concluded that Malhan was not suicidal and he expressed concern about how his children would react to seeing their father arrested.

118.   Malhan was arrested in New York and spent ten days in jail, for the first week Myronova refused to accept any calls from the jail so that Malhan could speak with his children.

119.   During this time Malhan was in jail, Myronova and her associates repeatedly told the children that Malhan would be in jail for years and that they should get

used to it.

### Malhan "Temporarily" Loses Custody in 2017 without Due Process which leads to additional Gag Orders and Restrictions on First Amendment Rights

120.   On September 11, 2017 Myronova filed an 18-page Order to show cause, and the only "evidence" alleged or attached was a statement by Myronova. Myronova did not claim to have witnessed any of the events but claimed to repeat a number of statements allegedly made to her by a couple of people repeating what the children supposedly told them that Malhan had said at an unspecified time and place. The main allegation was that Malhan told the children he was going to commit suicide by eating a dirty napkin off the floor.

121.   At a proceeding September 12, 2017 Presiding Judge Katz suspended Malhan's custody and stated he was acting on secret ex parte communication Judge Katz had received from the New Jersey Division of Child Protection and Permanency (DCPP).

122.   Judge Katz stated that he was not going to tell Malhan what the allegations were, but promised him to keep his separation from the children short.

123.   Judge Katz acknowledged that it was difficult for Malhan not to even be informed of the allegation against him: "difficult as it is for the <u>defendant because he</u> has denied it, <u>doesn't understand the basis of</u> [the court's actions].

124.   Judge Katz also stated: "<u>I do have information, and it's not that I've done an investigation *ex parte* before the lawyers came in. We have -- every vicinage has a DCPP liaison. Our staff reached out to the liaison.</u>"

125.   The Court did not set a return date for the OTSC but the order merely stated: "Parties to appear 10/6/17 at 9:30."   9/12/17 Order.

126.   Malhan consulted again with Dr. Abrams, who at this point had a long and extensive history with the family.

127.   In September 2017, Dr. Abrams submitted a report to the court concluding that Malhan was not and had never been suicidal and that separation

from his children was already damaging the parent child relationship.

128.     Dr. Abrams report was ignored by Judge Katz.

129.     At the October 6, 2017 proceeding, Malhan again moved for the Court to dismiss all restrictions on Malhan and restore his custody, again noting that no evidence had ever been admitted that permitted the Court to suspend Malhan's custody.

130.     In response the Court stated that Malhan did not know what the allegations were and the Court was not going to tell him:

> THE COURT: But you know the Division interviewed the children. You do know that?
> MR. CLARK: Right, but that's not -- that's not corroboration of anything.
> THE COURT: **Well, you don't** --
> MR. CLARK: Anybody could talk to anybody else.
> THE COURT: -- **know, and I'm not about to disclose what the children may or may not have said**, but -- but based on that, the Division has requested a psychological evaluation.

131.     The Court per Judge Katz continued to rely on this secret evidence to deny Malhan any custody.

132.     Judge Katz also refused to Order any parenting time, even supervised.

133.     Judge Katz informed Malhan that he would not permit Malhan to have any custody of his children ever unless he saw a psychologist recommended by DCPP.

134.     Malhan under threat of permanently losing custody went to see Dr. Chester Sigafoos, appointed by DCPP.

135.     Sigafoos purported to evaluate Malhan on October 16, 2017.

136.     To protect himself Malhan recorded the session with Dr. Sigafoos.

137.     The entire session with Sigafoos lasted 77 minutes, which was apparently adequate to conclude that Malhan was plainly not suicidal.

138.     However, Courts have routinely held that one hour is insufficient to obtain a meaningful psychological diagnosis. Painter v. Atwood, 2013 WL 5428059, at *3 (D. Nev 2013).

139.   Sigafoos purported to administer the Millon Clinical Multiaxial Inventory (MCMI). The MCMI "consists of 175 true-false questions and is designed to provide differentiation among groups of adults in significant emotional or psychological distress." Muhammad v. State, 46 S.W.3d 493, 507 (Tex. App.—El Paso 2001).

140.   In fact, Sigafoos only gave Malhan 35 of the 175 questions, which renders any opinion based on this alleged test invalid; as the Court cited above has explained:

> The Minnesota Multiphasic Personality Inventory was developed in the 1930's as a diagnostic tool in the examination and treatment of psychological pathology. It was refined in 1989 to remove certain "offensive" questions and eliminate sexist language; the test's current version is designated the MMPI II. It is an objective test; that is, it requires that the same questions be asked in the same order every time it is administered. … It is designed with internal validity scales to discern attempts by the test taker to deceive. The Millon Clinical Multiaxial Inventory (MCMI) is a second objective personality inventory modeled after the MMPI and developed in the 1960's.

141.   Malhan was only able to begin to properly evaluate the Sigafoos report two months later when part of it was provided to Dr. Abrams, who immediately noted glaring deficiencies.

142.   In October 2017, Myronova's counsel in court admitted that Myronova was monitoring all phone calls between Malhan and his children.   Myronova would hang up the phone if Malhan or the children said something Myronova did not like—accordingly, from September 2017 until the filing of this complaint Malhan has not has any private conversations with either of his children in person or by electronic means.

143.   On November 29, 2017, after the Court had the DCPP Report for more than a week (November 23 was Thanksgiving), counsel for Malhan emailed the family Court judicial clerk reminding the Court that Judge Katz has stated he intended to have the parties come in the day after the DCPP report was received and pointing

out that Malhan had been told by DCPP that the report had been sent to the court prior to Thanksgiving.

144.   Needless to say, the Court in September 2017 treated the suspension of Malhan's custody as emergent but did not treat restoring custody as emergent.

145.   At the November 30 proceeding the family court announced that DCPP had concluded that the allegations were unfounded and had closed the case and that Malhan was not any sort of danger to his children.

146.   The Sigafoos report was not admitted into evidence.

147.   Nothing in the Sigafoos report caused DCPP to pursue any further action against Malhan, and the report did not claim Malhan was an unfit parent or danger to the children as Defendant Judge Katz noted on the record.

148.   Nevertheless, Judge Katz asserted that he was concerned by some of the things in the Sigafoos/DCPP documents and demanded that Malhan go to yet another psychologist before he would regain physical custody.

149.   Malhan then asked the Court to immediately restore Malhan's custody rights and go back to the four overnights per week Malhan had exercised from August 2012 until September 2017, but Judge Katz refused insisting he see another psychologist.

150.   At this point the Court had been provided reports from Dr. Turco, Dr. Sena, Dr. Pasternak, Dr. Abrams and Medina (the psychiatric intake from jail when Malhan was arrested)—all were totally ignored.

151.   Attempting to follow the demands of Judge Katz, Malhan quickly set up an appointment with certified therapist Danica Rozario, M.A. of Mindkind Counseling Services, who was recommended by Dr, Abrams.

152.   Malhan reported back to the court that he had followed through on the court's demand and had one session with Rozario.

153.   Myronova and the Court vetoed Rozario because Dr. Abrams has recommended her.

22

154.   Rozario was the NINTH mental health expert Malhan had consulted.

155.   Still attempting to satisfy the Court's increasingly absurd demands Malhan later began to consult with licensed therapist Gregory Levine, from Betterhelp, but Myronova insisted she did not like Levine either.

156.   Levine was the TENTH mental health expert Malhan had consulted.

157.   In or around January 2018 Judge Kessler appointed a Dr. Gerald Figurelli to do an assessment of the two children and apparently report back to the Court.

158.   This assessment was apparently arranged through DCPP.

159.   However, Dr. Figurelli never interviewed Malhan at all.

160.   Dr. Figurelli apparently met once with Myronova and the children together and prepared a brief report (or two reports, one on each child) based on what Myronova told him.

161.   When Judge Kessler received the report he was dissatisfied and on February 8, 2018, the Court per Judge Kessler ruled that Figurelli reports were not reliable:

> THE COURT: I'm extremely concerned about them because Ms. Myronova played a very big role in it and it didn't look as though it was an independent evaluation of the children. … I said it did not appear to me to be an independent evaluation of the children because she -- she, you know, Ms. Myronova was an active participant by virtue of the way the reports were written.
> MS. TOROSIAN: I -- I -- I -- I don't know exactly where that says that in the report.
> THE COURT: Well, she relies in great detail on the things that were told to her during the evaluation process by Ms. Myronova. I don't even know why she was interviewing her. The whole idea was to try to evaluate the children. I, --
> MR. CLARK: Right, and they didn't speak to Mr. Malhan.
> THE COURT: -- you know, I think we're going to have to find somebody else to do those evaluations. I was -- I sent them out, but I was not satisfied with them.

162.   It was largely as result of Judge Kessler's dissatisfaction with Figurelli that he appointed a Guardian ad Litem and then Dr. Thomas Golden.

163.   In March 2018, the Court per Judge Kessler appointed a Guardian ad Litem,

Mary Ann Stokes, to investigate the situation and make recommendations.

164. Malhan was required to pay a $5000 retainer to GAL Stokes.

165. GAL Stokes subsequently interacted and evaluated Malhan and the children for many hours, and she can be considered the ELEVENTH person Malhan had consulted.

166. In or around March 2018 the Court per Judge Kessler also provided Malhan a list of psychologists from which Malhan would supposedly be permitted to choose which included Dr. Sharon Montgomery, Dr. Thomas Golden and Dr. Michelle Lacatoure and several others

167. Although the court had said that Malhan could pick from the list, Judge Kessler suddenly appointed Lacouture to be the court appointed therapist/expert.

168. Malhan had only limited contact with Dr. Lacouture, but she can be considered the TWELFTH mental health professional Malhan had consulted.

169. Just a few days after Judge Kessler appointed Dr. Lacouture, Dr. Thomas Golden became available.

170. Dr. Thomas Golden had fifty years of experience and is one of the most, experienced child psychologists in New Jersey with particular expertise in parental alienation.

171. Because Dr. Loucature had not met with anyone yet, Malhan asked the court to appoint Dr. Golden rather than Dr. Lacouture, and the GAL agreed.

172. GAL Stokes met with Malhan and the children and concluded that there was no problem with Malhan.

173. On April 6, 2018 GAL Stokes in a conference call with the Court on the Record recommended to the court (per Judge Kessler) that supervision was not necessary and recommended getting back to normal, unsupervised parenting time as soon as possible.

174. Over the next two months Dr. Golden met with Malhan and the children and Myronova numerous times, spending about 50 hours on the case.

24

175.   Malhan paid approximately $12,600 to GAL Stokes and approximately $15,000 to Dr. Golden.

176.   This $27,600 was in addition to the almost $10,000 the family court ordered Malhan to pay Dr. White/Fretz in 2015 and 2016, and $29,400 to Dr. Pasternak.

177.   Dr. Golden was the THIRTEENTH mental health professional Malhan had consulted—not one of the thirteen had anything significantly bad to say about Malhan, and none of them concluded he was an unfit parent or threat to his children and not one had ever diagnosed him with any sort of mental illness.

178.   On June 5, 2018 the GAL, in association with Dr. Golden recommended that the Court order that Malhan get unsupervised custody.

179.   On June 5, 2018 the GAL also reported that Dr. Thomas Golden, who the Court per Judge Kessler had appointed as a hybrid expert/therapist had also recommended an end to "supervision."

180.   GAL Stokes later submitted a written report dated August 13, 2018 that largely consisted of a transcript of her comments on June 5, 2018 that she asked Malhan to transcribe and send to the Court.

181.   On a call with the GAL and counsel, a transcript of which was provided to the Court two days later, Dr. Golden recommended:

> Well this is very important, for those of you who are there, Paul and the other attorneys, excuse me. This is a major piece. There is absolutely no need from my perspective- the several times I've been with the children and the Dad for me to be there, or for MaryAnn to be there ... There's no reason for a policemen a supervisor, someone watching over He's not abusive, he won't abuse them, I don't think they will abuse him. … I just want the supervision to end. It's arbitrary and doesn't do a thing for anyone's well-being. …   Neither of us feels that this man is a child abuser. Neither of us feels that these children are a danger with their Dad he's never demonstrated anything of the sort. Right?   Right.   He had the children 24/7 ... How did the children get abused by that? They didn't get abused by that.

182.   On August 13, 2018 GAL Stokes submitted a written GAL report again

recommending return to normal parenting for Malhan.

> And so this is where we come to what Dr. Golden and I want to recommend. I think we can go right to the recommendation.   I don't know if you need more background but I think you get the sense of where I am going.
>
> We see no reason for Dad' s parenting time to be supervised any longer. Starting this weekend his time can be unsupervised.   Dr. Golden is of the opinion and Tom if I say something that you want to jump in, please feel free to jump in. Dr. Golden believes that reunification therapy is not going to change the behavior of the children, Dad or Mom. What Dad is not going to like is what we are proposing as his parenting time but this is what we are proposing:
>
> Immediate no more reunification therapy. Let's let it play out in the real world in real life.   **Put Dad and the kids back together. No more supervision**.

183.   Both GAL Stokes and Dr. Golden opined that Myronova was refusing to cooperate with visitation and was actively controlling and discouraging the children from seeing their father.

184.   Dr. Golden (the Court appointed therapist/expert) opined that:

> The children are suffering because they know my mommy dislikes my daddy and my daddy dislikes my mother. And my life with my mom might be compromised if I show too much affect--not affection, forget about affection, if I show too much approached behavior to my daddy my mother won't be so pleased.
>
> Golden Comments June 5 (provided to the Court June 7)

185.   Despite this report by Dr. Golden and Mary Ann Stokes (which concurred with the findings of Dr. Abrams) in August 2018 the Court per Judge Katz insisted that Malhan must be to blame and said he wanted to hear to from a therapist, Kristen Luzzi, who was chosen by Myronova.

186.   Only a year later when Malhan obtained additional copies of health records from JCMC was it learned that Myronova and her counsel had been talking to Luzzi about Malhan. These health records from JCMC, stated that on 08/22/18

Myronova's attorney Linda Torosian called Kristen Luzzi of JCMC to discuss "father's mental health and possible treatment":

> SPT/Supervisor received a call from patient's mother's attorney, Linda Torosian regarding upcoming court hearing on Friday. Discussed concerns related to patient and sibling refusing unsupervised visits with their father. Addressed concern related patient needs. Discussed discontinuing unsupervised visits, need to address father's mental health and possible treatment, and possibly resuming supervised visits, which were more successful.

187.   Because Malhan was not permitted to cross examine or depose Luzzi in 2018 this information did not come out until 2019.

188.   Meanwhile on September 12, 2018, GAL Stokes again told the Court that Malhan should have unrestricted unsupervised custody.

189.   Again the Court per Judge Katz insisted that the therapist chosen by Myronova would come up with a plan:

> THE COURT: -- [S]omebody has to come up with a plan and I need an expert to come up with a plan and I – I assume that's Ms. Luzzi that's going to come up with a plan.
> Sep 12, 2018 Tr. 23:20-24.

190.   GAL Stokes was deposed September 21, 2018.

191.   GAL Stokes had a number of remarkable things to say about the case, later provided to Defendant Judge Katz prior to the October 19, 2018 proceeding.

192.   Notably GAL Stokes notified that "I don't think dad's a bad dad":

> I don't think dad's a bad dad by any means and I don't think he has ever been physically abusive to the children or that they suffer any threats at his hand, or that they have not been well cared for in dad's care, if that's, if that's what you want to know. I have not seen any evidence of the children not being well cared for physically in dad's care.
> Stokes Tr. 172:20-173:1

193.   This opinion in fact was the unanimous opinion of the more then one dozen mental health experts involved in the case.

194.   Remarkably, the GAL Stokes testified that under Myronova's tutelage Malhan's daughter was in danger of becoming a **sociopath** because Myronova was teaching and encouraging her daughter to treat her father like garbage:

> I know this is an awful thing to say and I'm saying it based upon my experience. I'm not a mental health professional, I can't diagnosis, but I have serious concerns about [daughter]. I do not -- I, I know from talking with mental health professionals on many cases, you can't diagnose a child as a sociopath but I do think [daughter] is on that road.. I hope I'm wrong.
> Q. That's very strong.
> A. But it's -- I really fear for her.
> …
> Q. Are you aware of any evidence of any type of sociopathic tendencies with [daughter] prior to September, 2017?
> A. No.

Stokes Deposition Testimony: 73:16-25 & 75:14-17.

195.   GAL Stokes added that after a year in the exclusive custody of Myronova: "The children needed serious, serious, help. They are in great distress." Tr. 164:2-3.

196.   GAL Stokes testified at length that Myronova was not cooperating and is actively interfering with and preventing Malhan's Court ordered visitation.

197.   GAL Stokes testified (Myronova attended the deposition):

> It was my role to find out why the children weren't getting out of the car and was mom interfering.
> Q. And you've concluded she was interfering?
> A. **I think she was interfering, I think she is interfering** and I'm saying to her now, show me that you weren't. You say you want them to have a relationship, let me see it.

GAL Stokes Dep Tr. 165:13-20 (emphasis added).

198.   Asked about Myronova's claim that she wants the children to have a relationship with their father, GAL Stokes responded:

> Q. Do you have any reason to suspect she's not telling the truth when she claims she wants them to have a relationship?

> A. So far I haven't seen any indication that she means it because she hasn't done anything to make it happen.
> Tr. 131:22-132:12 (emphasis added).

199.   One other important point GAL Stokes made was that she noted that orders requiring one parent not to "disparage" the other were totally unenforceable against the parent who was permitted physical custody:   "Unless you're going to put cameras and video recordings and audio recordings in every room, how do you enforce these kinds of orders?"

200.   In October 2018, the Court per Judge Katz called Kristen Luzzi as a witness.

201.   Despite the court per Jude Kessler appointing GAL Stokes and Dr. Golden to evaluate the situation and make recommendations to the Court, the Court per Judge Katz insisted that Ms. Luzzi should testify.

202.   Luzzi had never treated Malhan, was not a custody expert and had been chosen by Myronova, yet she had nothing substantially bad to say about Malhan in any event.

203.   GAL Stokes asked Luzzi if she had any suggestions as to how to get Myronova to cooperate and allow Malhan custody:

> MS. STOKES: I was asking whether or not you had any opinion of how to structure parenting time so that mom [Myronova] will cooperate and see that the children have time with dad [Malhan].
> MS. LUZZI: Right, so if -- I mean, I believe both parents are responsible and – and they're – you know, it's -- it's hard to (indiscernible) are communicating to their children that affects the relationship. That's -- that's first. And as far as -- it's not my place to make a decision or a determination about how visits should occur.
> Oct 19, 2018 Tr. 23:21-24:7

204.   Judge Katz through leading questions eventually got Ms. Luzzi to not disagree that *maybe* supervised visitation was a good idea.

205.   Defendant Judge Katz asked Luzzi if she agreed that Malhan should have "therapeutic visitation":

> THE COURT: Well, are you talking about therapeutic visitation? Is

29

that what this is pretty much, you know -- sounds to me that's how to
accomplish some of this is real time therapeutic visits. … Is -- is the
way to address these concerns to reduce the resistance, according to
you, by the father and the approaches and the "be more in the
moment", would that be --
MS. LUZZI: And I -- I -- sorry.
THE COURT: -- would be accomplished through some type of
therapeutic visitation?
MS. LUZZI: I don't have -- I -- I don't – I don't know.

Oct 19, 2018 Tr. 28:7-29:2.

206.   Apparently based on the above, Judge Katz directed that Malhan would only
be permitted therapeutic visitation with his children (i.e. visitation in the presence
of a paid therapist)—however, the Court in March 2019 ruled it was removing this
requirement and removing all restriction on Malhan.

207.   In October 2018, Judge Katz demanded that Malhan suggest a therapist for
therapeutic visitation and/or therapy, and Malhan requested Dr. Golden who had
previously been court appointed, but the Court rejected Dr. Golden.

208.   On October 25, 2018 Malhan's Counsel, emailed the court clerk to Judge
Katz, informing the Court that pursuant to the Court's instructions on the record
Malhan recommended Dr. Golden to continue "therapy."

209.   Judge Katz rejected Dr. Golden as therapist, and asked Myronova to
recommended an alternative.

210.   On November 1, 2018, Judge Katz issued an order purporting to explain
why Malhan's parenting was to be supervised until further notice:

On October 19, 2018, the Court was advised that the children
allegedly experience fear and worry and were uncomfortable during
the father's parenting time. The Court was advised that Mr. Malhan
allegedly refers to the children by nicknames, despite their request
that he not do so. The Court was advised that when the children had a
visit with their father and food was ordered, Mr. Malhan allegedly
continued to eat off his child's plate despite the child expressly asking
that he not do so, resulting in the child shutting down and refusing to
eat. Apparently that child may be "phobic" about his food. The Court

was advised that Mr. Malhan allegedly just sat at the visit "doing nothing" and left the visit for an extended time in order to "purchase a donut." …   After listening to the professionals and argument of counsel, the Court on October 19, 2018 attempted to structure an arrangement with therapeutic and supervised parenting time pending a final hearing. The Court has been conducting expeditious [sic] proceedings in an effort to move this matter to final hearing and the Court created a parenting plan following the October 19, 2018 conference.
Court Order Nov 1, 2018.

211.   All of these allegations had been refuted by Malhan, but notably the worst allegation was that Malhan had allegedly eaten food, "a french fry," off of his son's plate at some undetermined point about a year earlier.

212.   In November 2018, following Luzzi's testimony before the Court on October 19, 2018, Malhan served a subpoena on Luzzi's employer, Jersey City Medical Center (JCMC), for production of letters or emails between Myronova and JCMC as well as to take the deposition of Ms. Luzzi in the first week of December.

213.   JCMC filed a motion to quash the deposition, and Judge Katz in a proceeding on February 22, 2019 quashed the subpoena to JCMC.

214.   At the proceeding on February 22, 2019 at which Judge Katz quashed the deposition testimony, Judge Katz stated that Ms. Luzzi had nothing relevant to say about any issue before the court.

215.   After the above Malhan posted the following on Facebook:

Today in court child predator Judge David B Katz explained why he kidnapped my children on 9/12/17.   He alleged that (a) I ate from my children's plate, French Fries and b) I called them Indian names --- [end]

216.   Myronova failed to recommend any alternative to Dr. Golden and on November 15, 2018 in compliance with the Courts Order Malhan's counsel emailed the Court:

The only name suggested by any party is Dr. Thomas Golden. I forwarded a proposed consent Order to opposing counsel Tuesday

morning (see below), but they have not responded. It has now been
more than 15 days since the Order. Pursuant to the October 29 Order I
ask the Court to appoint Dr. Golden.

217.  Despite the Oct 29, 2018 Court Order that purported to set a strict deadline,

Defendant Judge Katz failed to appoint Dr. Golden, or anyone else—for five

months.

218.  In November and December 2018, Malhan repeatedly complained to the

Court that this "therapeutic visitation was clearly a sham because the court said

Malhan could only see the children in therapy but refused to either appoint a new

therapist or permit Dr. Golden to continue.

219.  As part of a motion, Malhan submitted a Certification to the Court again

complaining about the delay in appointing Dr. Golden stating:

> **On October 18 [sic], 2018 (after months and months of delay) this Court
> ostensibly ordered that I would have "therapeutic parenting time" and
> then ostensibly ordered that parties exchange names and confer and
> finalize within fifteen days. We promptly complied and provided a
> name (Dr. Thomas Golden); Alina has not provided any name either by
> the deadline or even now a month later—and this Court has let yet
> another month go by having done nothing to appoint Dr. Golden.
> Meanwhile the Court apparently blames me for the delay.**
> Without any evidentiary basis whatsoever this Court blames me invoking
> my constitutional rights for redress as somehow causing every one else to
> refuse to cooperate. Month after month, now year after tragic year, this
> Court has created excuses to refuse to fully restore my parental rights.
> Malhan Cert 11/26/2018 (emphasis added)

220.  On or about November 27, 2018 Malhan provided the court with a letter

from Dr. Golden, dated November 20, 2018, in which Dr. Golden confirmed that

he was available to do reunification therapy.

221.  Yet again Malhan's certification submitted on January 9, 2019 described yet

again this history and pointed out that the whole "plan" is a sham:

> Finally, attached as Exhibit D480 are invoices that Dr. Golden
> provided directly to this Court and presumably qualify as business

32

records. These records show that Dr. Golden has invested significant time in this case and is familiar with it. To be clear, it is clear to me that this Court ordering "therapeutic parenting time" after the sham proceeding on October 19, 2018 is just another sham excuse for this Court to allow the continued alienation of my children hoping that the alienation will grow so severe that it will be irreversible. GAL Stokes and Dr. Golden and Dr. Abrams have all said these children need time with their father. The fact that Your Honor ordered therapeutic parenting back on October 19 and not one minute of therapeutic parenting has taken place in the last ten weeks is compelling evidence that the whole "plan" was always a sham. The Court pretended that this was a priority and ordered that the parties to exchange names in 5 days. I complied they did not. Every time Alina violates a court order Your Honor makes excuses for her.

But if I am going to be forced to participate in the sham, at least Dr. Golden is competent. He has 49 years experience and is already familiar with the case, and already knows me and the children. He has also agreed to see us at his local office in Hoboken that is very close. My attorney asked this Court, pursuant to the deadline Your Honor imposed to appoint the "counselor" back on 11/15 my counsel asked the Court to Appoint Dr. Golden – the only name submitted by anyone, yet no action was ever taken.

Malhan Cert Jan 9, 2019.

222.   On January 15, 2019, Malhan's counsel sent another letter to the Court responding to a letter by opposing counsel and concluding : "I also ask the Court to appoint Dr. Golden to supervise therapeutic visitation."

223.   Yet again on Jan 21, 2019 Malhan sent a certification to the Court reiterating his position in no uncertain terms that the Judge Katz plan was a sham but Malhan nonetheless demanded that the Court appoint Dr. Golden:

50. As I told this Court earlier this month and repeat again Dr. Golden has invested significant time in this case (about 50 hours) and is at least familiar with it, the children already know him, and he seems to have a good relationship. He also has fifty years of experience in therapy including reunification therapy. In Spring of last year Judge Kessler gave a list of names of recommended therapists to my counsel and told him to arrange for one of them. Dr. Golden was by far the most experienced and competent person on the list.

51. It is clear to me that this Court, per Judge Katz ordering "therapeutic parenting time" after the sham proceeding on October 19, 2018 is just another sham excuse for this Court to allow the continued alienation of my children hoping that the alienation will grow so severe that it will be irreversible. GAL Stoke and Dr. Golden and Dr. Abrams have all said these children need time with their father. The fact that Your Honor ordered therapeutic parenting back on October 19 and not one minute of therapeutic parenting has taken place in the last three is compelling evidence that the whole "plan" was always a sham.

....

53. The Court pretended that this was a priority and ordered that the parties to exchange names in 5 days. I complied they did not. Every time Alina violates a court order Your Honor makes excuses for her.

57. But if I am going to be forced to participate in the sham, at least Dr. Golden is competent.

Malhan Cert Reply Motion to Sell 5G, Jan 21, 2019.

224. Malhan over and over again for a period of months reminded Defendant Judge Katz of his purported desire to appoint a therapist and the entire time Defendant Judge Katz failed to appoint anyone to supervise "therapeutic visitation."

225. Even a dog knows the difference between being kicked and being tripped over.

226. As of March 4, 2019 Judge Katz still had not appointed anyone to be a therapist that he claimed was needed, but on March 4 he issued an order and statement of reasons, that claimed:

> [T]he third front concerns the Court's efforts to have new professionals in place to facilitate Defendant's parenting in furtherance of the Court orders lifting the restrictions on Defendant's parenting time. In that regard, the Court had directed the parties to attempt to agree on an acceptable reunification therapist. See Order dated October 29, 2018, para. 3. In furtherance of the October 29, 2018 Order, Defendant proposed Dr. Golden to serve as the reunification therapist. The instant record does not contain the date that Defendant proposed Dr. Golden.

34

227.   Remarkably, the comment fails to note that the Court on both October 19 and October 29 had set specific deadlines—deadlines that Myronova missed but Malhan did not.

228.   Malhan informed the court of the designation of Dr. Golden on multiple dates, October 25, 2018 and again on November 15, 2018 (and several more times after that).

229.   The "reasons" goes on to suggest that Malhan is somehow responsible for the Court's failure to respond to his repeated requests to appoint Dr. Golden:

> Defendant, although dilatory in responding to Plaintiffs December 5, 2018 letter, received some 11 weeks earlier, should be afforded an opportunity to respond to Plaintiffs proposed reunification therapist before the Court makes its appointment, especially since Defendant is the party that needs to be reunified. As such, Defendant shall respond to Plaintiffs December 5, 2018 letter by March 6, 2019 (10 days from the oral ruling), and indicate whether either of the suggested therapists is acceptable to Defendant.

230.   It is remarkable that the Court accused Malhan of being "dilatory" but failed to mention the numerous times that Malhan made his position plain. It is even more remarkable that the Court saw no problem with Myronova delaying until December 5, 2018 (long past the Court appointed deadline) to make her recommendation.

231.   On March 15, 2019 Defendant Judge Katz finally agreed to have a proceeding to begin to discuss visitation and therapy.

232.   In the proceeding March 15 Judge Katz stated (ruled):

> THE COURT: I am not requiring supervised visits. Let's be very clear. I don't think Mr. Malhan needs supervised visits. I've seen that thrown around, and I want to be clear that on two occasions I've lifted the need for supervision. Which driving the Court is the reports that I've been reading with respect to the children. And so I -- I definitely agree with Counsel, that this is to help facilitate, to help transition because there was some concern by Mr. Malhan that just the presence of Ms. Myronova was, you know, caustic or polluting his time with

his children.

So I think we're -- I think we can hopefully turn this around quickly. I don't think we need a credentialed person, necessarily, to facilitate and assist in the transition. … I can do this on Monday. So I'd like you to get two or three names, and Mr. Wong sounds like one of the names. So get two other names, and I want Ms. Julian to get those names by Monday. And Ms. Julian, by the end of the Monday, Tuesday morning, get back to Mr. Clark. I suspect you'll have an arrangement. … But if there's an objection, get me something Tuesday. … I'll arrange my staff to get you all on the phone Tuesday afternoon so we can keep within that, you know, relative 48 hour as best we can, time frame.

Trans. 3/15/19 Tr. 5:16-6:2.

233.   According to the above, Malhan was to have unsupervised custody, and allegedly the Court was only looking for someone to help with "transition" between Myronova and Malhan because Myronova was not cooperating.

234.   This again turned out to be a false promise.

235.   At the same proceeding after apparently ruling that Malhan did not need supervision Judge Katz turned to the issue of therapy; as noted above Malhan had long maintained that no therapist was needed but if one was to be employed that Dr. Golden should be the one.

236.   At the March 15, 2019 proceeding Judge Katz discussed with the parties various suggestions for therapists, however, the issue was not decided that day

237.   The following week, on or about March 20, 2019 Myronova objected to all of the names submitted by Malhan.

238.   Defendant Judge Katz then scheduled a further proceeding to discuss the "therapists" and appointment of a friend of Malhan to effectively "supervise" visitation (even though Judge Katz had stated "I am not requiring supervised visits.")

239.   Defendant Judge Katz insisted that Malhan and his children see therapists and indicated at the proceeding that Judge Katz would approve George Wong but only subject to a list of conditions that would delay indefinitely Wong actually

36

being able to do anything.

240.   On March 26, 2019 Defendant Judge Katz issued an Order that provided:

> 1. Victor Llerena is hereby appointed as parenting time/reunification therapist, and Bayonne Community Mental Health Center is hereby appointed as the children's therapist.
> 2. The parties are directed to cooperate with the parenting time/reunification therapist and the children's therapist.
> 3. **The parties shall limit their email, telephone and facsimile communications to only the communications requested, or authorized, by the appointed individuals or entities.   The parties shall not send any of the above individuals or entities email or facsimile communications without their express written permission.**
> 4. George Wong is appointed as parenting facilitator. The facilitator is ordered to follow and adhere to any suggestions, recommendations or directives of the parenting time/reunification therapist and the children's therapist. … The visits are to commence forthwith as soon as the following conditions are satisfied: …
> c. that the children have had a least two appointments with the therapist at BCMHC and with Victor Llerena (to be undertaken forthwith [sic]), and Defendant has had at least one appointment with Victor Llerena.

Statement of Reasons also dated March 26, 2019 (emphasis added).

241.   Victor Llerena was now the FOURTEENTH therapist Malhan was to see.

242.   Victor Llerena was the person chosen by Myronova.

243.   It is important that Malhan's friend Wong was not permit to facilitate any "visits" until "the children have had a least two appointments with the therapist at BCMHC and with Victor Llerena."

244.   The condition that "the children have had a least two appointments with the therapist at BCMHC and with Victor Llerena" was another sham that was intended to do nothing more than prevent any visitation.

245.   The March 26, 2019 "sham plan" has never been implemented.

246.   Note that Judge Katz placed restrictions on Malhan's ability to communicate

with Mr. Llerena.

247.   The Statement of Reasons also dated March 26, 2019 also stated

> The Court has held several conferences in an effort to facilitate
> reunification between Defendant and his children. As noted, the Court
> has twice lifted Court-imposed restrictions. However, reunification
> has not been effectuated due to several issues regarding: 1) the
> wellbeing of the children, as articulated by the children's former
> therapist (Ms. Luzzi) [who the court was blocking from being
> deposed] and the Supervised visitation report.

248.   Viktor Llerena works alone and no one was present at his office when
Malhan attempted to make contact.

249.   On April 3, 2019 there was a brief proceeding at which Malhan's counsel
brought to the attention of the Court that Malhan had attempted to contact Victor
Llerena but the Court's restrictions were making it difficult for him to do so.

250.   On the record April 3, 2019 Judge Katz said he would allow Malhan to call
Llerena to try to set up a visit.

251.   Malhan was only then able to call Victor Llerena who told Malhan he had no
time for the foreseeable future.

252.   On April 5, 2019 Malhan's counsel wrote Defendant Judge Katz

> The most recent event that precipitates this letter is an email from
> Victor Llerena dated 4/4/2019 5:24:31 PM stating:
>> Hi Surender. I am looking at my calendar and my next availability
>> is May 31st.   After that I do not have availability until June 19th.
>> As discussed with you I am the only practitioner in my office. I do
>> not think I will be fit to give you the services your family requires
>> and deserves.
> Full email attached
> As a result we ask, yet again, that this Court order immediate
> resumption of Mr. Malhan's parenting time.

253.   But in response to this letter Defendant Judge Katz refused to order any
visitation at all, whether facilitated by Wong or anyone else.

254.   On May 13, 2019 Malhan's counsel sent a letter to the Court as follow up to

earlier letters on the same topic, asking the Court to immediately permit unsupervised contact or in the alternative to permit an alternative therapist to Llerena, but the Court did not respond to this letter.

255.   On May 22, 2019, Malhan sent another letter to the Court again bringing up the need for contact between Malhan and his children, and again asking for an alternative "therapist" if the court continued to insist on therapy.

256.   On May 29, 2019, in court the issue was brought up asking the Court to allow a different therapist (if one was required at all) as Malhan's counsel had requested twice in two letters earlier that month. Defendant Judge Katz refused to take any action that day stating:

> I do want to see what I can do about – reunification and although it's not before me today, I get the sense there's some roadblock that's another hurdle because of Mr. Malhan's --or the parties' inability to get a reunification therapist on board. I expected some sort of motion on that[.]

Tr. May 29, 2019, 57:11-20

257.   Note that Defendant Judge Katz instinctively blamed Malhan.

258.   Malhan pointed out to Judge Katz that this constant demand for more and new therapists was clearly a sham and that Judge Katz was merely demanding ever more therapists, nevertheless just to play along with farce Malhan asked Judge Katz to permit Peter Herbst to replace Victor Llerena.

259.   Judge Katz refused to take any action for over three months, he made Malhan file a motion in early June and then took six weeks to even approve the new therapist-Peter Herbst.

260.   To backtrack a little bit, in May 2018, Malhan saw yet another therapist Jennifer Mclaughlin.

261.   Mclaughlin was at least now the FIFTEENTH therapist Malhan was to see.

262.   After an initial meeting with Mclaughlin, she determined that she was not

able to be of service in the case.

263.   In April and May 2019 Malhan was able to retain Dr. Les Linet, M.D. to do a follow-up custody evaluation.

264.   Dr. Linet was at least now the SIXTEENTH therapist Malhan was to see or consult.

265.   Although Malhan predicted that Judge Katz would never allow Malhan to see his children Malhan asked Judge Katz to appoint Dr. Golden or in the alternative Peter Herbst just to fulfill the outlines of the Sham Plan of March 2019.

266.   On June 3, 2019 Malhan met with Peter Herbst for the first time to try to get the situation moving.

267.   Peter Herbst was now at least now the SEVENTEENTH therapist Malhan was to see or consult.

268.   The meeting between Mr. Herbst and Malhan on June 3 lasted only about an hour and Malhan provided a summary of the problems he had encountered with losing custody.

269.   Mr. Herbst was skeptical of the story, for example, he stated explicitly that "DCPP would not remove kids because the parent is suicidal."

270.   Malhan assured Herbst that he had documentation for everything he had told him such as transcript of the proceeding in September 2017 at which Judge Katz took away custody on false allegations that he was suicidal, and based on multiple levels of hearsay.

271.   Malhan told Herbst that he would send him this documentation.

272.   Although Herbst was not enthusiastic about reviewing a large number or records he appeared to agree that Malhan could send him the records.

273.   On June 3, Mr. Herbst told Malhan that he would next like to meet with the children, however, it was clear that Myronova would not cooperate without a court order requiring the children to see Mr. Herbst.

274.   On June 7, 2019 Malhan filed a motion asking the court to order a specific

custody schedule, or in the alternative appointing Dr. Golden, or in the third alternative merely appointing Peter Herbst to replace Victor Llerena.

275.   On July 19, 2019 Judge Katz issued an Order saying: "Defendant's request to resume physical custody (Mondays through Fridays) is hereby DENIED … Defendant's request to permit Dr. Golden to provide therapeutic visitation is hereby DENIED."

276.   Paragraph 15 of the July 19, 2019 Order stated:

> 15. The parties shall schedule appointments with Mr. Herbst by telephone call to his office with conversation on the call limited to scheduling purposes only. The parties' substantive and other communication with Mr. Herbst shall take place during scheduled sessions with Mr. Herbst. The parties shall limit their email, telephone and facsimile communications with Peter Herbst to only communication requested or authorized by him, or for scheduling purposes as set forth herein. At no time shall the parties attempt to engage Mr. Herbst in the adversarial divorce process.

277.   The above Gag Order placed significant restrictions on Malhan what he could even discuss with Peter Herbst.

278.   The Order also stated that Peter Herbst was substituted for Victor Llerena in the March 26, 2019 Sham Plan Order.

279.   It should be noted that Malhan's motion did not request and the Court Order did not order or suggest that Herbst was to make any reports, recommendations or contacts with the court, Herbst's only role was to provide therapy not to make recommendations.

280.   On August 20, 2019, Malhan met with Peter Herbst again--this was the second visit.

281.   At the August 20, 2019 Malhan explained to Mr. Herbst that he had been evaluated by numerous psychologists and psychiatrists and had never been diagnosed with any illness or found to be any sort of threat to his children.

282.   Mr. Herbst specifically asked Malhan to send him copies of all the

psychological evaluations that he had.

283.   Malhan agreed to send Herbst these evaluations and also stated he would send Herbst additional documentation of the history to show that Malhan was not paranoid but could back up everything he was saying.

284.   During this relationship, Malhan repeatedly asked Mr. Herbst to verify that Malhan's conversations with Mr. Herbst were confidential and Mr. Herbst assured him that they were, although there might at some point be exceptions.

285.   Herbst confirmed to Malhan that he considered both Malhan and his children to be Herbst's clients because he was supposed to be doing reunification therapy with Malhan and the children (and it is not clear whether Mr. Herbst regarded Myronova as a client or not).

286.   The restriction in paragraph 15 quoted above made it impossible for Malhan to even have a full, normal relationship with Mr. Herbst.

287.   For example, as noted above at the August 20, 2019 meeting Herbst requested a large number of documents Malhan agreed to send him those and more related documents, yet it appears that after Herbst read the court order (saying "At no time shall the parties attempt to engage Mr. Herbst in the adversarial divorce process")   he refused to read any of the documents that Malhan sent him.

288.   On September 20, 2019 Herbst met with Myronova, however, the substance of that meeting is largely unknown as Herbst has refused to disclose what happened and has stated that his conversations with Myronova are confidential.

289.   Nevertheless, in a later October 16, 2019 letter to the Court (discussed below), Herbst mentioned several of the things discussed by Myronova at this meeting.

290.   The October 16 letter describes a broad variety of allegations made by Myronova against Malhan including the following:

> Ms. Myronova described the circumstances under which she and Mr. Malhan met and married which differed from Mr. Mulhan's version.

… She said the marriage became "toxic" after four incidents , one of which involved Mr. Mulhan's business and an audit by the U.S. Department of Labor.

291.   The above comments appear to violate the Court order that: "At no time shall the parties attempt to engage Mr. Herbst in the adversarial divorce process."

292.   On 9/22/19, when Malhan contacted Mr. Herbst to see if another visit could be scheduled, Herbst informed Malhan that all therapy sessions were cancelled until further notice.

293.   When Malhan asked why therapy was cancelled, Herbst would only tell Malhan that he would be sending a letter to the court explaining the reasons why therapy was being halted.

294.   Malhan told Herbst that he was very concerned because a) it was not Herbst's job to communicate with the court, it was only his job to provide therapy and b) Malhan again informed Herbst that it was his understanding that his communications with Herbst were confidential and Malhan did not want Herbst to breach this confidentiality.

295.   Malhan also cautioned Herbst that it would be inappropriate to send anything to the court ex parte and that anything Herbst sent to the court should also be sent to the parties as well.

296.   On October 16, 2019 Herbst sent a three and half page letter to the court, the letter was unsolicited by the court, and was merely a normal letter—it was not sworn or sent under oath or penalty of perjury.

297.   The letter repeated a variety of comments and allegations made by both Myronova and Malhan and contained what was labeled "Assessment" that suggested that Herbst was not equipped to deal with the case:

### Assessment
This case is rife with parental accusations, contradictions and conflicts and the children are "collateral damage." Each parent accuses the other parent of manipulation and cruelty. … The children's lack of

interest in maintaining a relationship with their father is sad and unfortunate but understandable  based on their experiences. At the same time, it is also possible that their stories were fabricated by their mother and they have been manipulated to see their father as a bad person.   However, it is not my role to conduct forensic interviews to establish truths or falsehoods.

298.   Finally without any explanation of the reason for any "recommendation" the letter concluded with recommendations that included:

> In my professional opinion, I recommend that:
> 1. Supervised visits be temporarily suspended.
> 2. Reunification therapy be temporarily suspended.

299.   Malhan objected to the court using the letter in any way since it was a) unsworn, b) inadmissible, c) not admitted, i.e. not moved into evidence, d) not subject to cross examination, and e) not scientifically valid as there was no explanation of the so-called recommendations.

300.   Malhan also objected that the Court had no basis for cherry-picking one unsworn letter while ignoring numerous sworn reports to the contrary by Dr. Turco, Dr. Borja, Dr. Abrams, Dr. Pasternak, Dr. Golden and Dr. Linet, among others.

301.   Despite the fact that the letter was never admitted the Court said it would accept and rely on the letter.

302.   Finally, the letter also mentioned that:

> Mr. Malhan provided me with several documents and psychological evaluations, some of which I requested in hopes of obtaining a broader understanding of this family. …
> On September 23, Mr. Malhan advised me how I should distribute this report. On September 30, after I refused Mr. Malhan's request for a third session, Mr. Malhan emailed me 65 paragraphs attacking the family court system, Ms. Myronova, her mother, grandmother and boyfriend, as well as other parties whom Ms. Myronova was able to recruit.

303.   Judge Katz, on the basis of this unsworn letter accused Malhan of violating

paragraph 15 of the July 19, 2019 Gag Order.

304.   Malhan declined to address the substance of any emails he may have sent Mr. Herbst, noting that these would be privileged communications and not admissible in evidence, but again reiterating his position that the various Gag Orders including this one violated the First Amendment.

305.   Malhan argued in particular that any sort of therapist-patient relationship required open channels of communication and thus the restraints on Malhan communicating with his therapist were unconstitutional.

306.   The court rejected Malhan's privacy and privilege arguments, and ordered that Herbst produce emails between Malhan and himself, although Judge Katz did delay the production date to allow Malhan time to seek appellate review.

307.   On November 18, 2019 Malhan filed a motion for expedited review of the Judge Katz production Order.

308.   The motion for expedited review was granted and the Appellate Division entered an Order staying the trial court production order until further notice. Docket # AM-152-19.

309.   Malhan fully briefed the privilege issue, however, in an Order dated December 31, 2019 the Appellate Division denied the motion for leave to appeal without comment and without addressing the privilege issue (or any other issue).

310.   The motion for leave to appeal also asked the Appellate Division to permit appeal of the custody issue as well.

311.   Following the Appellate Division denial of leave to appeal, Peter Herbst himself retained counsel and filed a motion with the trial court to quash the subpoena arguing that the communications with Malhan were privileged and should not be made public.

312.   Herbst's motion was ultimately denied in March 2020.

313.   To conclude the discussion of Peter Herbst, in October 2019 when Dr. Linet saw the letter from Peter Herbst he sent Herbst a letter entitled "Professional to

Professional Letter of Diagnostic Concern" in which he cautioned Herbst that his letter to the court may have violated several standards of professional conduct.

314.  Finally, in November, 2019, Malhan filed a complaint with the Board of Social Work Examiners noting that: "Mr. Peter Herbst, improperly provided an opinion on parenting time when he was serving as a treating therapist, constituting a dual relationship in violation of N.J.A.C. 13:44G-13, 3."

315.  As of the filing of this complaint, in May 2020, no trial has been completed.

316.  Judge Katz purported to begin trial in the summer of 2019, however, Myronva has presented only one witness, herself, who has been on the stand since September 2019.

317.  Almost all of Myronva's testimony has been a complete waste of time.

318.  Many of the issues Myronova wishes to testify about are res judicata from the FV case in Hudson county.

319.  Defendant Judge Katz despite clear precedent to the contrary has ruled the FV case is not res judicata.   See J.F. v. B.K., 308 N.J. Super. 387, 392 (N.J. Super. App. Div. 1998) ("Plaintiff's prior complaint alleging some or all of the prior acts which the court found to constitute acts of domestic violence was dismissed after a hearing. Therefore, even if those acts had been alleged in the present complaint, plaintiff would be precluded under principles of res judicata and collateral estoppel from re-litigating allegations which had been decided adversely to her in the earlier hearing."

320.  Despite being aware of this precedent Defendant Judge Katz has permitted Myronova to testify for many hours attempting to re-litigate issues resolved by the FV case.

321.  Hours of Myronova's testimony consist in discussing the very same emails that she presented to the FV Court in 2016.

322.  As March 2020 Judge Katz suspended trial totally, over Malhan's objection, and as of May 2020 no further trial dates are scheduled.

323.   As of May 2020, Malhan has had no contact whatsoever with either of his children since January 2020.

324.   Myrovna refuses to allow the children to even speak with Malhan on the phone and Defendant Judge Katz approves of this no contact.

**Facts Related to Additional Gag Orders, Restrictions on Association and restriction of fundamental parental rights**

325.   To understand restrictions and Gag Order entered in early 2020 it is necessary to set forth some further background.

326.   As noted above, in September 2017 the Court per Judge Katz without explanation suspended Malhan's legal custody as well as physical custody, however, the November 30, 2017 Order vacated this and Malhan's legal custody was restored (but he still had almost no physical contact with the children).

327.   In June 2018 Malhan's daughter underwent an operation under general anesthesia, for an injury that has never been explained and when Malhan tried to ask his daughter about the injury (his only conversations were supervised so he could not ask her in confidence) Malhan was told she did not know.

328.   Malhan only found out about the injury at all because a third party (Maureen Grippo who was a supervisor/baby sitter chosen by Myronova) told him about it.

329.   Malhan was not consulted nor was his consent sought and the hospital operated on his daughter without Malhan's consent.

330.   When Malhan attempted to discuss the injury with medical office staff Malhan was told they could not tell him confidential information because Myronova had reported to them that she had sole legal custody and Myronova had not given her permission for Malhan to be informed.

331.   Malhan recorded the conversation with physician reporting that Myronova told them that she had sole legal custody.

332.   Malhan told the medical facility that this was false, he shared joint legal

custody and demanded that the hospital demand that Myronova provide them a copy of any order that said she had sole legal custody.

333.   Not only did the medical facility refuse to talk to Malhan but refused to give him copies of his daughter's medical records claiming that Malhan did not have legal custody based on Myronova's assertion that she had sole legal custody.

334.   In late June 2018 Malhan filed a motion with the Court asking to sanction Myronova and asking the court to specifically order that Malhan was to be consulted on any medical decisions, or any important decisions related to his children.

335.   Remarkably, Judge Katz claimed his chamber lost this motion and even after being reminded of the motion in October, the Court took another six months to address it.

336.   Because AM was telling the doctors not to communicate with Malhan, Malhan was forced to serve a subpoena on Riverside Medical Group North Bergen to obtain records.

337.   The subpoena was actually served by Nikita Persaud, who later executed a certification describing the service.

338.   Ms. Persaud was also accompanied by Mr. Malhan.

339.   Ms. Persaud and Malhan also audio recorded the entire visit.

340.   Remarkably, soon after this subpoena was issued Myronova's counsel sent a letter to the GAL accusing Malhan during this visit of assaulting several healthcare workers.

341.   Myronova's counsel's letter to the GAL asked the GAL not to inform Malhan or his counsel of the allegations of multiple assaults supposedly because if Malhan found out that the staff was accusing him of assault that he would retaliate.

342.   In fact, the GAL did inform Malhan of these false allegations of assault.

343.   In response Malhan provided the GAL with a copy of the audio tape of the visit as well as an affidavit from Ms. Persaud that there had been no problems.

344.   The GAL later testified that she was satisfied from this evidence that the allegations Myronova and her counsel had made against Malhan were false.

345.   Remarkably, in late 2019, after Malhan's June 2019 motion had been pending for about six months, Myronova's counsel acknowledged that they had no basis for opposing an order clarifying that Malhan had joint legal custody and said they would agree to a consent order.

346.   Despite saying they would agree to a consent Order that Malhan had joint legal custody they ultimately refused to consent to anything.

347.   When Myronova's counsel refused to consent, the Court per Judge Katz said he would decide the motion.

348.   Myronova said she should not be sanctioned for telling the hospital that she had sole legal custody because she insisted that the September 2017 Order had never been vacated, even as her counsel acknowledged that they had no legal basis for claiming Malhan did not have joint custody.

349.   On March 5, 2019, Judge Katz finally issued an order on the June 2018 motion that was, in its most significant issue (that of joint custody) uncontested.

350.   This inexplicable delay was the deliberate result of a policy of Judge Katz to interfere with Malhan's legal rights through administrative denial, because there was no conceivable legal basis for outright denial.

351.   In any event the March 5, 2019 Order declined to sanction or criticize Myronova and provided:

> ORDERED:
> 1. Plaintiff Alina Myronova and Defendant Surender Malhan share joint legal custody of the parties' two minor children, [son] and [daughter]. Plaintiff's counsel stated in court that she understood there were no restrictions on Defendant's legal rights in connection with the November 18, 2017 Order; however, to avoid any confusion, the Court orders that, pursuant to N.J.S.A. 9:2-4, the parties shall share "in making major decisions regarding the children's health, education and general welfare." Specifically, but not limited to:

a. Both parties are to participate in making medical decisions for the two children and to be with the children during treatment;

b. Neither party shall unilaterally make a major health decision for either child without the knowledge and agreement of the other parent;

c. Both parties are to participate meaningfully in any decisions involving any treatment of the children;

d. Any significant developments affecting either child shall be promptly reported to the other parent;

352.  The Court indicated this Order was required by N.J.S.A. 9:2-4—which had been Malhan's position for the past year.

353.  Even after this Order was entered Myronova violated every single one of these provisions by unilaterally arranging for "therapy" and high school applications without the prior knowledge or consent of Malhan, then shutting him out of any participation, and not "promptly" reporting anything.

354.  Malhan has been and is as of the filing of this complaint totally shut out of any decisions involving his children—Malhan has not been consulted about anything affecting his children in over two years.

355.  Malhan (again) asked the Court to permit him physical custody or even at a bare minimum allow someone to replace the apparently deceased Maureen Grippo, and the Court ordered --

The visits are to commence forthwith as soon as the following conditions are satisfied:

…

c. that the children have had a least two appointments with the therapist at BCMHC and with Victor Llerena (to be undertaken forthwith), and Defendant has had at least one appointment with Victor Llerena.

356.  Malhan objected immediately and repeatedly that this was a sham.

357.  On July 18, 2019 Malhan brought up how bad the March 26 Order was and that it failed to provide any schedule or deadlines for its implementation:

THE COURT: [S]ee if we can get him some money somewhere to get going, and then have Mr. Malhan and everybody else follow the March 26th order, I think it's the March 26th, it's the end of March, and we'll be good. We're good.

MR. CLARK: The March order is not good, Your Honor, because --

THE COURT: Well, --

MR. CLARK: -- it doesn't provide --

THE COURT: -- you don't agree with it.

MR. CLARK: -- any schedule.

THE COURT: Yes, it does.

MR. CLARK: No, it doesn't.

…

THE COURT: Let me -- let me just point you to -- to ease here. Once that order is complied with, I expect there to be liberal, ample parenting time. If you and Ms. Julian don't work -- can't work that out once that order is complied with, I am here.

Tr. July 18, 2019 104:17-105:24.

358. Again, and remarkably, Judge Katz refused to enforce any parenting time even once the Sham Order was met but said he expected Myronova to agree.

359. On September 6, 2019 Malhan again complained and informed the court that there had been no therapy done or even scheduled so clearly the March 26 Order was a sham.   Trans. September 6, 2019 35:19-36:1.

360. On September 6, Judge Katz purported to be concerned that there had been no appointments at BCMHC that had been a condition precedent to the Court enforcing any custody orders.

361. Technically in 2019 there were a couple of orders in effect that provided for physical custody for Malhan but Myronova simply ignored them and Judge Katz refused to sanction her—for example, there was a holiday Order in effect that had never been vacated.

362. For example, the holiday Order provided that the children would spend Thanksgivings in odd numbered years with Malhan and in even numbered years with Myronova.

363. In Thanksgiving 2017 Malhan had missed seeing the children due to the September 2017 Order suspending legal and physical custody, but 2019 was again his year to spend Thanksgiving with the children.

364.   The holiday parenting time Order in effect since 2014 and never vacated stated that Malhan's would have physical custody of the children following school let out on the Wednesday before Thanksgiving.

365.   On the Wednesday before Thanksgiving Malhan hoping to at least see the children and wish them a happy thanksgiving, but the school blocked him form even seeing the children.

366.   The school prevented the children from seeing their father and called Myronova to come and pick them up.

367.   Myronova took them home with her and did not permit Malhan to see the children in violation of the long-standing holiday parenting time order.

368.   It should be noted that at this time Malhan was rarely seeing or having any contact with his children.

369.   Although Malhan as a bare minimum alternative to enforcement of the other orders, asked for and received a court order that Malhan would have visitation at the courthouse, Myronova repeatedly refused to bring the children to the Courthouse.

370.   One excuse Myronova had given in October and November 2019 was that she had unilaterally enrolled the son in a high school prep course on Saturday mornings at the same time as the court ordered visits.

371.   Malhan filed a motion asking the court to enforce the court house visitation order and asking to sanction Myronova who had no authority to unilaterally ignore the court order and decide she could enroll the son in a program Saturday mornings.

372.   Malhan also asked the court for alternative visitation schedule but this was denied.

373.   This was not the first time Myronova had used this excuse to violate court orders, in 2011 when Malhan had court ordered courthouse visitation Saturday mornings she enrolled the son in soccer and told the court (at that time Judge

Sogluizzo) that soccer was more important than their father, but the court in 2011 told her to follow the court order.

374.   In any event, Malhan complained that Myronova was not following any of the custody Orders and in December 2019 asked the court to enforce the holiday parenting time order or in the alternative to give him just 60 minutes with his children at some time, any time during their Christmas break to wish them a Happy Christmas and give them a Christmas present.

375.    The request for 60 minutes either at the courthouse or anyplace else was denied by the Court—Malhan did not see his children at all for the entire Christmas season.

376.   Meanwhile on 12/17/2019 Malhan emailed Myronova inquiring about therapy for the children.

377.   Myronova responded, "intake was on 12/03 and 12/04 and the therapy sessions start this week."

378.   This intake was at North Star in Bayonne.

379.   Indeed, on December 23, 2019 Myronova's counsel informed the Court: "They [the children] have no[w] just started therapy and have each had about one session (plus an intake interview)."

380.   Upon learning that there had been two appointments with North Star Malhan pointed out that the provisions of the Sham Order of March 26, 2019 had been met and asked the Court to enforce its Sham Order but noted that he had no doubt that the Court would find some excuse for not following its own order.

381.   As noted above, Wong was not permit to facilitate any "visits" until "the children have had a least two appointments with the therapist at BCMHC and with Victor Llerena" But Malhan pointed out in June and September 2019 that Myronova had not scheduled any therapy appointments with BCMHC.

382.   However, Myronova did meet with BCMHC to do an intake and Malhan was able to obtain copies of the intake records.

383.   One statement found in the intake record from when Myronova met with BCMHC to do the "intake" was "Ct [client] is a 13 year old male … <u>Ct & ct's mother described the father to have an unknown mental illness</u>. Father acts erratically and bizarrely."

384.   Malhan has never been diagnosed with any mental illness.

385.   "Ct" here is Malhan's son, and according to the above record Malhan's son "<u>described the father to have an unknown mental illness</u>" the only source for such a belief is that Myronova told son that Malhan had a mental illness."

386.   When Malhan's children lived with him, they told him that Myronova would talk about him in this way, saying such things as he was a criminal and had mental illness.

387.   As of May 2020 Malhan has not had one minute of private conversation with his son or daughter since September 2017, during that 2.5 years Myronova has been free to say anything she wants about Malhan and Malhan is unable to respond at all.

388.   Myronova has been telling the children for years that the Court had restricted Malhan's custody because he is mentally ill.

389.   The BCMHC intake record also contained the following:

> Client is a 9 year old female. Client reported her ethnicity as Hispanic and her race as Caucasian. <u>Client's mother reported</u> that client is referred by Essex County Court for outpatient therapy services. <u>Client's mother reported</u> that she and her husband are going through a difficult and lengthy divorce. <u>Client's mother reported</u> that client was receiving therapy before at JCMC but client's father sued the client's therapist and JCMC. <u>Client's mother reported</u> that client's therapist withdrew and they were advised to come to this agency for continuation of mental health services. <u>Client's mother reported</u> that client was court ordered to receive therapy due to the parents going through over 8 years divorce battle.
> <u>Client's mother reported</u> that there was an aniation [alienation] from client's father against her. Therefore, the court system is recommending for client to seek therapy for adjustment. <u>Client's mother denied</u> that the client has any mental health or behavioral issues.

> <u>Client's mother reported</u> that client's father has psychiatric problems.
> <u>Client's mother reported</u> that client's father has history of SI [suicidal ideation]
> Therapist met with both ct & ct's biological mother to discuss the course of treatment. …
> Ct is not having any problems but does experience anxiety & stress each Saturday before going to the supervised visits with father at the court house. Ct has a hx of being emotionally/verbally abused by father over the years. Ct & ct's mother described the father to have an unknown mental illness. Father acts erratically and bizarrely. Ct was receiving treatment from a therapist in Jersey City from July 2017 till March 2019,   however the treatment ended because ct's father sued the therapist.   Ct is no longer welcome by that therapist.   <u>Mother stated</u> that father sued 4 judges in Jersey City & the children's therapist for "conspiracy."

390.   From the above it clear that the "intake" was almost entirely based on what Myronova reported—Malhan was not permitted any role in the "intake."

391.   As of April 2020 Malhan has not had one minute of private conversation with his son or daughter since September 2017, during that 2.5 years Myronova has been free to say anything she wants about Malhan and Malhan is unable to respond at all.

392.   These false allegations of mental illness against Malhan were not limited to Myronova but even picked up by her counsel.

393.   At about the same time that Malhan obtained health records from BCMHC Malhan also obtained updated Health Records from JCMC, and that record stated that on 08/22/18 Myronova's attorney Linda Torosian called Kristen Luzzi of JCMC to discuss "father's mental health and possible treatment":

> SPT/Supervisor received a call from patient's mother's attorney, Linda Torosian regarding upcoming court hearing on Friday. Discussed concerns related to patient and sibling refusing unsupervised visits with their father. Addressed concern related patient needs. Discussed discontinuing unsupervised visits, need to address father's mental health and possible treatment, and possibly resuming supervised visits, which were more successful.

394.   The above is part of a constant campaign by Myronova and her agents to falsely accused Malhan of "mental illness."

395.   On October 19, 2019, Malhan filed a motion with the family court demanding that all gag orders and restrictions on Malhan's ability to communicate with therapists witnesses or anyone else be vacated.

396.   Malhan attached the records from JCMC and BCMHC that included the report that: "Ct & ct's mother described the father to have an unknown mental illness. Father acts erratically and bizarrely."

397.   Malhan pointed out that the Gag Orders were effectively one sided: although phrased in the form that neither parent could discuss the other parent with the children, Myronova has clearly told the children (falsely) that Malhan had a mental illness.

398.   Although phrased in the form that neither parent should involve therapists in custody dispute, Myronova was plainly doing just that.

399.   The October 19, 2019 Motion asked the court to vacate the Gag Order or at least hold Myronova responsible—but the court did neither.

400.   Malhan also continued to point out that the Sham Plan of March 26, 2019 was not being remotely followed by Myronova.

401.   Mr. Wong was not permit to facilitate any "visits" until "the children have had at least two appointments with the therapist at BCMHC and with Victor Llerena" But Malhan pointed out that as of October 2019 Myronova had not scheduled any therapy appointments with any therapists at BCMHC and had only done a sham intake full of false allegations against Malhan.

402.   In response to Malhan's criticisms Myronova did finally arrange for some therapy at an alternate site in Bayonne.

403.   Myronova did not ask for Malhan's consent for the new therapist, who Myronova unilaterally selected, but Myronova after substantial criticism did reveal to Malhan the new therapist—North Star supervised by Dr. Paul Hriso, M.D.

404.   Moreover, in response to Malhan's revelations about Myronova's BCMHC intake record accusing Malhan falsely of mental illness, Myronova's response to Malhan's October 2019 motion to vacate all Gag Orders was to ask the Court to further Gag and restrict Malhan.

405.   Specifically, Myronova asked the court to prohibit Malhan from having any contact with North Star or any other therapists selected unilaterally by Myronova.

406.   While Myronova' motion for the expanded Gag Order was still pending, Malhan met with staff at North Star, including Dr. Paul Hriso, M.D.

407.   Paul Hriso was now at least now the EIGHTEENTH therapist Malhan was to see or consult.

408.   Dr. Hriso was consulting and supervising doctor for therapists for the children, but Dr. Hriso said he would like to work with Malhan and try to work out ways to repair the obvious alienation of the children from Malhan (who at this point had been separated for over two years).

409.   After learning more about the background North Star/Dr. Hriso determined that "individual therapy" with the children was pointless and what was needed was reunification therapy with Dr. Golden or someone similar.

410.   On January 23, 2020, North Star sent a letter to the parties, to the Court and to Dr. Thomas Golden that stated:

> This letter will serve to formally advise both parents of the above referenced minor children have been therapeutically discharged from treatment at our facility as of this date. Our clinical team strongly recommends that a court appointed therapist familiar with the children and their custodial history be provided in the best interest of the children and as clinically recommended by our Medical Director, Paul Hriso, M.D.

411.   Malhan again asked the Court to re-appoint Thomas Golden for therapy as this was clearly the recommendation of Dr. Hriso, but Judge Katz eventually refused.

412.   On January 27, 2020, the Court blamed Malhan again (again without evidence or even making findings) and ordered:

> Defendant is hereby precluded from visiting, contacting or corresponding with NorthStar and its therapist(s) unless and until specifically requested by NorthStar for the reasons stated in the accompanying opinion. The parties shall limit their email, telephone, and facsimile communications with NorthStar to only communications requested or authorized by them of their therapists, or for scheduling purposes. At no time shall the parties attempt to engage NorthStar or their therapists in the adversarial divorce process.

Ex. 3, to Complaint

413.   The above order was followed by a second order two days later (dated January 29, 2020), notable was that in the Statement of Reasons, Judge Katz also stated that Malhan's counsel was precluded from contacting NorthStar:

> Plaintiff's [Myronova's] counsel [Julian] advises that the children each had their own therapist at NorthStar, were engaged in the process, and seemed to be progressing.    Following an alleged visit to NorthStar's offices by Defendant and his counsel, the Court has been advised that NorthStar has terminated their services. In their letter, NorthStar made certain statements about the therapist's need to be aware of the custodial history of this matter.   Ms. Julian represented that she was informed that Defendant told NorthStar he does not consent to the children's therapy.   Mr. Malhan's views on therapy are well documented and have been set forth at length in prior Opinions, most recently in the December 2, 2019 and January 27, 2020 Opinions. <u>As such, only Ms. Julian is to contact NorthStar, in accordance with the attached Order</u>.

414.   As can be seen from the above, the court accepted the "representations" of Myronova's counsel as unassailably true, and neither Malhan nor his counsel (and presumably no one on their behalf) was permitted to contact North Star that had become an important witness in the case to even contest Myronova's version.

415.   It should also be noted that the North Star letter said nothing about Malhan not consenting to therapy, yet the Court Statement said: "Ms. Julian represented

that she was informed that Defendant told North Star he does not consent to the children's therapy."   Julian did not testify and even if she had, repeating what she was allegedly told would plainly be inadmissible hearsay, but these assertions were the basis for the latest incarnation of the Gag Order.

**High School Gag Order and Freedom of Association**

416.   In a related issue, Malhan's son was applying to high schools, but Malhan (despite having legal custody) had been entirely shut out of the process and not permitted to even know where his son was applying.

417.   Malhan asked the Court to enforce the law and permit him a role in the application and section process.

418.   As noted above, on March 5, 2019 the Court had ordered: "to avoid any confusion, the Court orders that, pursuant to N.J.S.A. 9:2-4, the parties shall share "in making major decisions regarding the children's health, education and general welfare."

419.   In late 2019 Judge Katz ruled that the application process was not a significant decision so Malhan had no right to be involved in the application decision but suggested that Malhan <u>might</u> be permitted to play a role when it came to making a final choice.

420.   In January 2020, Myronova filed an Order to Show Cause asking the court to allow her to unilaterally make the decision what high school Malhan's son would attend.

421.   Myronova's OTSC did not name the high school and asked the Court to preclude Malhan from finding out.

422.   Myronova's OTSC claimed the high school was his son's first choice.

423.   Judge Katz asked Malhan if he would consent to Myronova's choice, and Malhan responded that he would like to talk to his son and if his son confirmed that this high school was where he wanted to go that Malhan would agree, but he

wanted to speak to his son about it.

424.   Malhan's son was in school that day, and Malhan asked the Court permit him to go to the school and meet with his son to discuss the decision, but Judge Katz refused this request.

425.   Malhan was not told the name of the school, however, through a mutual acquaintance Malhan later learned that the school was Delbarton High School—a private Catholic High School that had gone through a terrible sexual abuse scandal in 2018, and the commute each way would be about 60 minutes.

426.   On January 30, 2020 the court issued an Order restraining Malhan from visiting or contacting <u>any</u> private high schools in New Jersey:

> Defendant [Malhan], or anyone on his behalf, is hereby precluded and enjoined from contacting, corresponding with, and/or communicating with any private high school in New Jersey and/or any of their agents or employees.
> <u>Exhibit 4 to Complaint</u>.

427.   This broad restriction remains in effect indefinitely.

428.   This Gag Order appears to apply to any agents of Malhan such as counsel or investigators.

429.   According to privateschoolreview.com there are 1,425 private schools in New Jersey, although it is not clear how many are high schools, however, the School Gag Order prevents Malhan from contacting hundreds of schools and thousands, if not tens of thousands, of individuals.

430.   Malhan desires to discuss his son's situation with Delbarton but is gagged.

431.   Malhan also desires to discuss his son's application process with other high schools to which his son may have applied, but is gagged.

432.   Malhan desire to contact other private schools that might be an alternative to Delbarton (either for 2021 or for later years) but is Gagged.

433.   The Statement of reasons dated January 31, 2020 also immediately connected the restraints with the Gag Order:

The Court also permitted Plaintiff to accept the preferred high school's acceptance and financial aid without disclosing the name of the school to Defendant.   …

The Court is not satisfied that a Protective Order precluding Defendant from contacting the preferred high school would be sufficient, for several reasons.

First, Defendant has willfully and blatantly violated prior Orders entered in the best interest of the children with which he has disagreed. The Court entered a Gag Order on June 18, 2015, that precluded either party from publicly posting about the children or custody issues in this case. That Order was entered in an effort to shield the children from the troubling allegations and contentiousness of this case. Defendant unsuccessfully moved on several occasions to vacate that Gag Order. By Order dated May 31, 2019, Defendant's motion to vacate was denied, and he was found to have violated the Order. Within one week, on June 5, 2019, and thereafter on July 22 and September 24, 2019, he again made public posts about the custody issues, in violation of the Order.

On December 2, 2019, Defendant was again found to have violated the Gag Order and was again warned that sanctions would be imposed if his violative conduct continued. Nevertheless, in an obvious affront to the Court, within three weeks (on December 24, and 25, 2019), Defendant made public posts on various social media platforms about the custody issues, in violation of the Order.

…

Another example of Defendant outright violating an Order he does not agree with concerns the reunification therapist. Mr. Peter Herbst was recommended by the Defendant to be the reunification therapist, and an Order was entered on July 19, 2019 making the switch from Victor Llerena to Mr. Herbst. That same Order, in Paragraph 15, limits each party's communication with Mr. Herbst to only communications requested or authorized by him so as not to engage him in the adversarial divorce process.    Mr. Herbst provided a report to the Court on October 16, 2019. He states in that report that on September 26, 2019, Defendant sent him a text "castigating" Plaintiff. Mr. Herbst reminded Defendant of the explicit prohibition of involving him in the adversarial divorce process.

Most recently, due to various statements and actions set forth in detail in the Court's January 27, 2020 Opinion, the Court ordered a psychological evaluation of Defendant.

434.   Malhan's complaints about the Gag Order and other restraints on Malhan's First Amendment rights to association have now been bootstrapped to justify yet further even more intrusive restrictions on his fundamental rights.

435.   As of this filing, Malhan remains restrained from contacting any private high school in New Jersey, even after Malhan informed the Court that the high school was known and so the broad restriction is even more untenable than ever.

**Court Ordered Psycho-Therapy and Privacy**

436.   As described above, Peter Herbst has been required (over his objection and Malhan's objection) to provide the court with confidential communications between Malhan and Herbst.

437.   Mr. Herbst through counsel has told the court that Herbst does not believe he can continue to provide therapy to any of the parties in the case.

438.   Malhan through counsel checked with Dr. Golden to confirm he was still available and Dr. Golden said he could proceed with the reunification therapy.

439.   Malhan in the course of the motion process informed the court that a) it was a violation of Malhan's constitutional rights to order Malhan to undergo therapy against his will, b) Malhan could not plausibly trust or rely on any therapist given that his communications with the therapist were not confidential as the Judge Katz had already, c) Judge Katz was placing restrictions on what Malhan could even discuss or provide to any therapist so therapy could not be effective, d) a Malhan had repeatedly commented and accurately predicted, the demand that he see therapists was unending, Malhan had consulted at least eighteen therapists or similar (not to mention DCPP case workers etc) yet the Court simply disregarded virtually all of them and cherry-picked parts of selective letters to reach a pre-determined result.

440.   Under these circumstances Malhan said the only therapist he would agree to see was Dr. Thomas Golden otherwise he would assert his constitutional right to refuse treatment.

441.   Although at oral argument Judge Katz appeared to concede that he could not force Malhan to undergo medical treatment, nonetheless Judge Katz ultimately ordered Malhan to participate in an "evaluation" with Dr. Sharon Montgomery.

442.   On January 27, 2020 the Court per Judge Katz ordered:

> Defendant [Malhan] shall be psychologically evaluated by Dr. Montgomery for the Reasons stated in the accompanying Opinion. Defendant is directed to contact Dr. Montgomery forthwith.

443.   Malhan contacted Dr. Montgomery, however, as of the filing of this complaint no psychological evaluation has begun.


**The June 18, 2015 Gag Order Continued and Updated**

444.   For several years between 2014 and rarely 2018 Malhan self-censored himself out of fear of persecution by the family court system of the State of New Jersey.

445.   Disappointed and appalled by his treatment at the hands of Judge Kessler and Judge Katz, Malhan is ready and willing to talk to members of the press about the court system and how it is destroying his family. Malhan wants to explain and educate the public about how money and corruption drives the custody issues in family courts; how therapists, psychologists are used as cover ups and to aid and abet crime and corruption, etc.

446.   As Judge Martini has already ruled: "Judge Kessler's gag order does not prohibit discussions that concern 'the minutia' of custody issues; instead, it plainly prohibits any discussions with the media that concern custody, period."

447.   Malhan has repeatedly complained about his treatment by Judge Katz taking away his custody but has out of concern for punishment avoided specifics about custody.

448.   Notwithstanding Malhan's continued attempts to self-censor himself to some degree Defendant Judge Katz still has repeatedly sanctioned Malhan for allegedly

violating the Gag Order.

449.   Notably, in an Order dated January 27, 2020 the Court per Judge Katz
monetarily sanctioned Malhan ordering:

> 2. Defendant is in violation of the June 18, 2015 Gag Order for the
> reasons stated in the accompanying Opinion. Based on the fact that
> prior adjudications and a caution of sanctions has not deterred
> Defendant, he is hereby sanctioned $1,000 for the December 24 and
> 25, 2019 posts. Each subsequent post will result in the sanction
> increasing $1,000 for each violative post;
> 3. Defendant's third application to vacate the Gag Order is hereby
> denied for the reasons stated in the accompanying Opinion;

450.   Notably, neither Judge Katz's Order nor opinion quoted the allegedly
offensive language of the December 24 and 25, 2019 posts, but the supposedly
violative post are all criticisms of Judge Katz as a public figure, attempting to
expose crime, corruption and abuse of power.

451.   The Statement of Reasons or Opinion of Defendant Katz went on to say:

> Defendant's latest or most recent postings, see Exhibit G to Plaintiff's
> Certification dated January 13, 2020, contain public posts made on
> Facebook and on YouTube. The posts are filled with ad hominem
> attacks of the undersigned, as well as the custody and parenting issues
> in this case involving the children.

452.   Malhan continues to write on social media about "kids for cash, custody for
cash," crime, corruption, abuse of power in family courts such as of Judge Katz,
about how children are being irreparably harmed for life; And since he has no
contact whatsoever with his children, in an effort to communicate with this
children, Malhan began posting daily "messages of love" on his Facebook page
and YouTube hoping that one day his children will see these messages/videos and
realize how much he was missing them and thinking about them even though he
had no contact with them.

453.   Myronova had asked Defendant Judge Katz to sanction in increasing amount

for each of his "messages of love" although to date Defendant Judge Katz has deferred decision on additional fines/sanctions

454.   As of the filing to this complaint Malhan faces hundreds of thousands of dollars in sanctions—i.e. each additional post is assessed at $2,000, $3000, $4000 and so forth with no limit. As of filing of this complaint it totals up to over $450,000.00 that Myronova is seeking in fines.

## COUNT ONE

## EXPEDITED DECLARATORY RELIEF THAT THE POLICY OF GAG ORDERS ISSUED WITHOUT DUE PROCESS OR COMPELLING STATE INTEREST VIOLATES FEDERAL LAW

455.   The above paragraphs are incorporated herein by reference.

456.   Upon information and belief, imposition of gag orders in family matters (sometimes based on alleged "best interest," sometimes not) is common in New Jersey. Borra v. Borra, 333 N.J. Super. 607, 614, 756 A.2d 647, 651 (Ch. Div. 2000) (ruling that "when presented with a choice between parent's rights and children's rights, children's welfare and best interests will always be paramount"); Kelly Kanavy, The State and the "psycho Ex-Wife": Parents' Rights, Children's Interests, and the First Amendment, 161 U. Pa. L. Rev. 1081, 1083-84 (2013) ("These types of [gag] orders, however, are actually quite common in family court proceedings."

457.   It is the policy and custom of Defendant Judge Katz and other family court judges (including Judges Sivilli and Kessler) to issue Gag Orders without factual basis, without expert opinion and without balancing any interests and merely citing vague concerns that children might see it and might be harmed.

458.   With respect to Malhan's case Judge Kessler issued the Gag order in a summary proceeding without any evidentiary hearing despite his own acknowledgement that Judge Martini had ruled that such a plenary hearing was

necessary.

459.   In this case Judge Kessler tried to justify the Gag Order saying it was necessary to protect confidential DCPP documents, but the Order is substantially overbroad for that alleged purpose, and the Gag Order has been entirely untethered to this alleged justification

460.   Judge Katz has continued to enforce this illegal order without even considering any amendment including sanctioning Malhan financially.

461.   Federal Courts to address this issue have routinely held such gag orders in family court to be unconstitutional. See also Nichols v. Sivilli, 2:14-3821 (WJM), 2016 WL 3388296, at *4 (D.N.J. June 14, 2016) (involving three separate Gag Orders) and authorities cited therein.

462.   State appellate courts also have repeatedly invalidated similar gag orders in family court.    *In re T.T.,* 779 N.W.2d 602, 612 (Ne. App. 2009); State Ex Rel. LM, 37 P.3d 1188 (Utah App. 2001); *In re K.D.,* 929 N.E.2d 863 (Ind. App. 2010); *In Re Marriage of Newell*, 192 P.3d 529, 538 (Colo. App. 2008).

463.   Accordingly, the policies at issue here violate clearly established law.

464.   Gag Orders prohibit Malhan from commenting about a story of public interest.

465.   Indeed, the previous suit by Paul Nichols received widespread attention, such as on the popular legal blog, The Volokh Conspiracy. <https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/12/30/first-amendment-challenge-to-broad-gag-order-on-family-court-litigants/?utm_term=.319d53b1e192>

466.   Moreover, Malhan's related successful appeal to the Third Circuit in Malhan v. Secretary U.S. Dep't of State, 938 F.3d 453, 456 (3d Cir. 2019) has also received widespread attention.   See. e.g., http://ca3blog.com/cases/new-opinion-rooker-feldman-again/

467.   The published opinion that is available on dozens of websites discusses

66

some of the details of the "custody dispute" such as

> The family court awarded Myronova full custody of the couple's two minor children and ordered Malhan to pay $6,000 per month for child and spousal support. Malhan also had to give Myronova rental income from their jointly owned properties, which the court earmarked for mortgage payments.
>
> After suffering these setbacks, Malhan received some favorable rulings from the family court. In 2012, he was awarded joint custody of the children, which increased their proportion of overnight stays with Malhan from zero to more than half. The year after, the court found Myronova owed Malhan about $44,000, half of which was rental income Myronova had embezzled for personal use rather than pay the mortgage.

  Malhan v. Sec. U.S. Dept. of State, 938 F.3d at 456.

468.   The case Malhan v. Secretary of State in less than a year has already been cited 36 times, and the decision itself is widely available on legal websites.

469.   There are hundreds of websites that discuss Malhan's legal campaign and aspect of his "custody" battle on a variety of prominent websites such the the American bar association.   https://www.abajournal.com/news/article/dads_

  sue_new_jersey_family_court_judges_claim_best_interest_of_the_child_st

470.   Some of the many other websites discussing Malhan's legal battles include:

https://lawdiva.wordpress.com/tag/surender-malhan/

https://www.commdiginews.com/life/family-judge-lisa-gorcyca-issues-gag-orders-and-jail-time-57804/

https://nationalparentsorganization.org/blog/22109-federal-judge-quashes-gag-order-by-new-jersey-family-court

https://www.pressreader.com/usa/the-trentonian-trenton-nj/20150115/281552289244702

https://prawfsblawg.blogs.com/prawfsblawg/2019/09/minding-the-abstention-gaps.html

http://blog.amjudges.org/?m=201503

http://blog.angry-dad.com/2015/01/nj-family-court-gag-order.html

471.   Many of Malhan's legal briefs are available on line to anyone who googles under the name of Malhan or Myronova:

https://casetext.com/brief/malhan-v-porrino_brief-in-opposition

472.   Numerous court decisions in Malhan's case that discuss specific custody issues are available on line to anyone who cares to look (even with a PACER account:

https://law.justia.com/cases/federal/district-courts/new-jersey/njdce/2:2016cv08889/342001/82/

https://law.justia.com/cases/federal/district-courts/new-jersey/njdce/2:2018cv00963/365025/26/

https://law.justia.com/cases/federal/district-courts/new-jersey/njdce/3:2014cv00760/299766/43/

https://law.justia.com/cases/federal/district-courts/new-jersey/njdce/2:2014cv03821/305314/35/

https://casetext.com/case/family-civil-liberties-union-v-new-jersey?q=Surender%20Malhan&p=1&tab=keyword&jxs=&sort=relevance&type=case

473.   Malhan's case, repeating details of his "custody situation" have even been discussed in law review articles:   Hasan, Noor-ul-ain, Jurisdictional Boomerang: How the Uniform Child Custody Jurisdiction and Enforcement Act Amplifies Hardship for Domestic Violence Survivors (February 10, 2020). GONZAGA LAW REVIEW, Vol. 56.

474.   The fact that details of Malhan's decade long legal battle are widely available on the internet negates any possible basis for a Gag Order to avoid "publicity."

475.   Moreover, even after years of publicity Myronova's own expert (although not admitted into evidence) opined in June 2019 "Neither child presently appears to be experiencing any adverse affects by any publicity in this case."   Page 21 of

unadmitted Dasher report dated June 21, 2019.

476.   In Defendant Judge Katz's latest denial to vacate the Gag Order dated January 27, 2020 Judge Katz denied Malhan's motion to vacate the Gag Order stating: "Plaintiff [Myronova] has proffered that her expert in this matter will be testifying that the public posts about the children and the issues in this case are harmful to the children."   Statement of Reasons p. 8.

477.   As can be seen from the above paragraph, the Gag Order is not based on any admitted evidence it is based on a proffer by Myronova that her expert will at some point in the future   testify "that the public posts about the children and the issues in this case are harmful to the children."

478.   This alleged proffer is contrary to unadmitted expert report that concluded in June 2019 "Neither child presently appears to be experiencing any adverse affects by any publicity in this case."   Page 21 of unadmitted Dasher report dated June 21, 2019.

479.   The alleged proffer cited by Defendant Judge Katz to support the Gag Order is that "public posts about the children and the issues in this case are [present tense] harmful to the children."

480.   Accordingly, the "proffer" cited by Defendant Judge Katz does not even reflect the opinion of Myronova's own expert.

481.   Insofar as it might later be argued that publicity might at some later date be harmful, this is precluded by the fact that much of this information has been in the public domain for years and the children have not suffered any ill effects from all of publicity.

482.   Although the Kessler Gag Order does not absolutely prohibit Malhan from speaking to the press, the restriction that Malhan not mention any "custody information" makes it impossible as a practical matter to perform a full and proper interview, and Defendant Katz has even stretched the Gag Order well beyond the confines of what Judge Kessler actually ordered.

483.   The primary issue that Malhan would want to discuss in an interview is his "loss" of custody, whether temporary or not.

484.   Moreover, although in theory Malhan could talk about the Gag Order itself, he could not even speak meaningfully about that because he cannot explain the background and why he thinks the Gag Order is unconstitutional.

485.   Third Parties subject to the effects of a gag order have standing to challenge such orders. *FOCUS v. Allegheny Cnty. Court of Common Pleas*, 75 F.3d 834, 836 (3d Cir. 1996).

486.   Members of the press are substantially impaired in their ability to cover a story of public interest that could affect tens of thousands of parents and their children.

487.   The 2018 Gag Order stating that Malhan cannot discuss ongoing litigation with his children was entered without due process and attacks not only First Amendment rights but attacks the very root of the parent child relationship.   See H. L. v. Matheson, 450 U.S. 398, 410 (1981) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected.).

488.   The fact that their parents are going through an annulment proceeding is by far the most important issue in the lives of the children, but Malhan is prohibited from discussing it with them.

489.   The Supreme Court has long held that "parents have an important 'guiding role' to play in the upbringing of their children ... which presumptively includes counseling them on important decisions." H.L., 450 U.S. at 410, (1981), and the Gag Order on Malhan prohibits discussion of the court case with this children.

490.   The Gag Order is unenforceable against Myronova but only affects Malhan.

491.   The Gag Order prohibiting Malhan from talking to school employees is intended to interfere with Malhan's fundamental parental rights to participate in his children's lives, and does so interfere.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a.    Under the Declaratory Judgment Act, declare that the gag orders are unconstitutional under the First and Fourteenth Amendments and the Commerce Clause of the United States Constitution, and are therefore invalid and unenforceable;

b.    Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c.    Award Plaintiff other and further relief as the Court deems proper.

COUNT TWO

INJUNCTIVE RELIEF AGAINST ENFORCEMENT OF GAG ORDERS

492.    The above paragraphs are incorporated herein by reference.

493.    Declaratory relief alone appears to be inadequate to remedy the constitutional violations at issue here.    Indeed, Judge Martini's decision was the effective equivalent of a declaratory Judgment yet Judge Kessler failed to comply with the federal court's December 2014 ruling that a Gag Order could; only be entered after more extensive proceedings.

494.    Indeed, even after acknowledging on the record that a plenary hearing was required, and even after scheduling a hearing at which no evidence was presented, Judge Kessler simply entered the June 2015 Gag Order "in the teeth" of this Court's December 2014 Order. Nichols v. Sivilli, CIV. 2:14-3821 WJM, 2014 WL 7332020 (D.N.J. Dec. 19, 2014).

495.    The Gag Order prohibiting Malhan from talking to school employees witnesses and therapists is intended to interfere with Malhan's fundamental parental rights to participate in his children's lives, and does so interfere.

496.    Malhan has repeatedly sought to have the New Jersey Appellate Division

review his case, but because the annulment case is not final there is no right to appeal and Malhan has no adequate recourse at law.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a.      Preliminarily and permanently enjoin Defendants and those persons in concert or participation with them from taking any actions to enforce the gag orders prohibiting Malhan from speaking with his children, members of the media, therapists, witnesses or school employees

b.      Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c.      Award Plaintiff other and further relief as the Court deems proper.

COUNT THREE

EXPEDITED DECLARATORY RELIEF THAT THE POLICY OF MANDATING PSYCHO-THERAPY IN A CUSTODY DISPUTE VIOLATES FEDERAL LAW

497.   The above paragraphs are incorporated herein by reference.

498.   Defendant Judge Katz has an established policy of ordering psycho-therapy evaluations on litigants in custody disputes and either directly sanctioning them or indirectly sanctioning them by taking away fundamental rights to custody of children if they refuse.

499.   Defendant Judge Katz's Statement of Reasons why Malhan was ordered to have an evaluation concluded:

> Defendant will be ordered to attend a psychological examination to determine his competence.   Dr. Montgomery is to determine if Defendant suffers from any condition that would inhibit his ability to parent the children. In addition, Defendant will be precluded and enjoined from entering the grounds of the children's school.

500.   In the above paragraph "competence" is not defined or explained.

501.   Malhan and his children face irreparable harm from this sham as it violates his federally guaranteed right to privacy.

502.   State ordered psychological evaluations intrude up the constitutionally proceed right to privacy and thus any state mandated evaluation must be narrowly drawn to achieve compelling State interests. McKenna v. Fargo, 451 F. Supp. 1355, 1381 (D.N.J. 1978) (citing Carey v. Population Serv. Int'l, 431 U.S. 678, 685-86 (1977).

503.   Here the State has no compelling interest in a 20th evaluation, and the order for a 20th evaluation is not narrowly drawn.

504.   In September 2017 Defendant Judge Katz informed Malhan that he would not permit Malhan to have any custody of his children ever unless he saw a psychologists recommended by DCPP.

505.   Sigafoos purported to evaluation Malhan on or about October 16, 2017.

506.   Regardless of the problems with the Sigafoos evaluation Malhan cooperated with this to attempt to get his children back.

507.   In 2018 the Court per Judge Kessler appointed Dr. Thomas Golden who did an extensive evaluation of Malhan and concluded Malhan had no significant mental issue.

508.   Malhan has been seen by numerous other psychologists and psychiatrists not one of whom has ever diagnosed Malhan with any significant mental issues.

509.   The demand for Malhan to have yet another "evaluation" is sham to justify the continued violation of Malhan's fundamental right to custody and thus cannot be a compelling state interest.

510.   Moreover, the actions of Defendant Judge are motivated by animosity towards Malhan as demonstrated by the Opinion itself.

511.   In the section of the opinion discussing the Gag Order and attempting to

justify the psychological evaluation Defendant Judge Katz repeatedly cites

criticisms of him Judge Katz as proof that Malhan must be crazy.

512.   Page 22-23 of the opinion quotes Malhan's criticisms of Judge Katz

> "God Save America! God Bless America with more Judges like Judge David B. Katz and more people like Jeffrey M. Rothstein who find such joy in psychologically murdering poor, helpless children! …
> "Before kidnapping my children Judge Katz carefully studied, evaluated that the mother Alina Myronova is an incredible fraud — Alina and her mother Viktoriya (Ukrainian) used me to come to America — Marriage Fraud, Immigration Fraud. Judge Katz studied how skillfully Alina and Viktoriya can lie, cheat, steal, manipulate -- and do any crime he asks them to do.   Judge Katz noted that Alina attempted murder and she has several times expressed her keen desire to murder me."

513.    This last sentence quoted above refers to the fact that when Defendant

Judge Katz suspended Malhan's custody in September 2017 Malhan provided the

court with a copy of an affidavit from Myronova's former employer who swore

under penalty of perjury that Myronova had repeatedly expressed her desire to kill

Malhan:

> [F]rom the first Alina joined DaVinciTek, she stated that if she could find someone to kill her husband and get away with it, she would. She would continue to talk about how bad the situation was with her husband and how he was making her go to court and that she was fine with him having everything that she didn't care including custody of her children. She also told me that "My mother hates him, referring to her husband and that her Mother would have him killed if she could." At first I thought she was just expressing frustration, but she repeatedly stated that she wanted him killed, or that she would if she could get away with it. After she told me this several times when should would bring this up in conversation, I found myself changing the subject to move from this. I was concerned, because in the back of my mind, I thought she was capable of following through with her plans if she found the right person based on how often she spoke about this.

Elaine Murtagh Affidavit

514.   The Elaine Murtagh Affidavit provided to Court Sept 12, 2017 and read in part to Judge Katz.   11/12/17 Transcript page 34.

515.   From the above Malhan has solid evidence to support his statement that "she has several times expressed her keen desire to murder me."

516.   Yet despite the Murtagh affidavit (in addition to much other evidence being presented to the Court to attempt to get Judge Katz to rule so that Malhan can seek relief at the Appellate Division), Defendant Judge Katz denies knowing about these threats writing in his Opinion:

> He [Malhan] believes the Court is aware of murder attempts and sent Defendant a ransom note of $1.2 million dollars, when this Court has not engaged in any economic mediation whatsoever, nor is it aware of any murder attempts. He believes that the children are being criminally exploited in a conspiracy involving the Court and the professionals.

517.   Judge Katz says he is not "aware if any murder attempts" despite having been read to him relevant parts of the Murtagh affidavit.

518.   This Murtagh affidavit also goes to the larger picture of the Gag Order on Malhan corresponding with or providing documents to Peter Herbst and others: Malhan stating that Myronova wants to kill him sounds like paranoia until one sees a sworn affidavit from a witness that is the basis of his comment.

519.   Judge Katz's other comments are equally disingenuous and display animosity and willful obtuseness, for example, Judge Katz quotes Malhan's Youtube post criticize him which says, "Judge Katz, give me my children or give me death":

> Judge David B Katz, Give my children freedom, set my children free or give me death. It has been over two long years since you kidnapped my children. Give my children freedom to see their father or give me death. Give me freedom or give me death.

520.   So that the reference would be obvious to even the most ignorant or obtuse

viewer, the description for this same video said:

> Please let me rephrase what men such as Mahatma Gandhi (MK Gandhi), Dr. Martin Luther King, Nelson Mandela said: "You may kill me, you may take possession of my dead body, but you will never take possession of my precious freedom. I will never allow you to take possession of my freedom!"
> …
> "Give me liberty, or give me death!" Patrick Henry.

521.   Judge Katz implicitly purports not to know about the famous Patrick Henry quote "Give me liberty or give me death."

522.   In one of the most famous speeches in American history Patrick Henry told the Virginia Convention on March 23 1775:

> Is life so dear, or peace so sweet, as to be purchased at the price of chains and slavery? Forbid it, Almighty God! I know not what course others may take; but as for me, give me liberty or give me death!

523.   Malhan paraphrased and alluded to one of the great patriotic speeches of American history, and for this speech defendant Judge Katz thinks Malhan and Patrick Henry must be mentally ill.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a.   Under the Declaratory Judgment Act that a family court may not require a psychological evaluation and this policy of requiring such evaluations is invalid and unconstitutional;

b.   Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c.   Award Plaintiff other and further relief as the Court deems proper.


COUNT FOUR

INJUNCTIVE RELIEF AGAINST ENFORCEMENT OF PSYCHO-THERAPY ORDERS

524.   The above paragraphs are incorporated herein by reference.

525.   Declaratory relief alone appears to be inadequate to remedy the constitutional violations at issue here.

526.   A preliminary and permanent injunction against the enforcement of the Order requiring psychiatric evaluation is necessary to prevent irremediable harm and protect fundamental rights.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a.   Preliminarily an permanently enjoin enforcement of any orders that a family court require a psychological evaluation and this policy of requiring such evaluations is invalid and unconstitutional;

b.   Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c.   Award Plaintiff other and further relief as the Court deems proper.

COUNT FIVE

EXPEDITED DECLARATORY RELIEF THAT THE POLICY OF CONTACTING WITNESSES AND SCHOOLS WHERE NO IMMINENT HARM HAS BEEN SHOWN OR ALLEGED VIOLATES FEDERAL LAW

527.   The above paragraphs are incorporated herein by reference.

528.   Defendant Judge Katz has an established policy of restricting freedom of association and access to witnesses in summary proceedings that violate federal law.

529.   Recently the Third Circuit clarified the requirements that apply when court restricts a litigant's contact with non-parties.

Courts have inherent power to keep their proceedings fair and orderly.

> They can use that power to order the parties before them not to talk with each other, the press, and the public. But that power comes with limits. The First Amendment requires that we tread carefully when we restrict speech. A court must thus explain why restricting speech advances a substantial government interest, consider less-restrictive alternatives, and ensure that any restriction does not sweep too broadly.

Bank of Hope v. Miye Chon, 938 F.3d 389, 392 (3d Cir. 2019)

530.  Here the family court did not explain why restricting speech advances a substantial government interest, or consider less restrictive alternatives or ensure that any restriction does not sweep too broadly.

531.  For example, the school order prevents Malhan from associating with tens of thousands of people in New Jersey.

532.  For example, another Gag Order prevents Malhan from communicating with or discussing matters of concern with witnesses and associates including Peter Herbst and employees of North Star.

533.  All of the restrictions on Malhan communicating with others were entered without any compelling state interest and are violations of Malhan's rights to speech, association and to participate in decisions affecting his children, and a denial of due process in restricting his access to witnesses.

## Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a)  Under the Declaratory Judgment Act, declare that the gag orders are unconstitutional under the First and Fourteenth Amendments and the Commerce Clause of the United States Constitution, and are therefore invalid and unenforceable;

b) Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c) Award Plaintiff other and further relief as the Court deems proper.

## COUNT SIX

## INJUNCTIVE RELIEF AGAINST ENFORCEMENT OF <u>ORDERS RESTRICTING FREEDOM OF ASSOCIATION</u> (<small>AGAINST ALL DEFENDANTS INCLUDING ATTORNEY GENERAL AND GOVERNOR</small>)

534.   The above paragraphs are incorporated herein by reference.

535.   An immediate injunction against the enforcement of the restrictions upon Malhan's association with thousands of fellow citizens is necessary to prevent irremediable harm and protect fundamental rights.

536.   All State Defendants must be enjoined from enforcing this illegal order.

### Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a.   Preliminarily and permanently enjoin Judge Katz, executive officials and those persons in concert or participation with them from taking any actions to enforce the gag orders.

b.   Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c.   Award Plaintiff other and further relief as the Court deems proper.

## COUNT SEVEN

## <u>EXPEDITED DECLARATORY RELIEF</u> THAT THE POLICY OF MANDATING PATIENT THERAPIST COMMUNICATIONS TO THE STATE AND PARTIES IN A CUSTODY DISPUTE VIOLATES FEDERAL LAW

537.   The above paragraphs are incorporated herein by reference.

538.   Defendant Judge Katz has an established policy of ordering the production of patient/therapist communications in custody disputes and either directly

sanctioning them or indirectly sanctioning them by taking away fundamental rights to custody of children based on such records.

539.   When defendant Judge Katz entered the Order requiring production of communications between Malhan and Herbst on November 15, 2019 he stated:

> Plaintiff argues that Defendant has again sabotaged the therapeutic component of the [March 26, 2019] reunification plan. According to Plaintiff, Defendant should be precluded from arguing that his parenting is being delayed while he is the cause of the delay. In its July 19, 2019 Order, the Court made clear that the parties were to limit their communications with Mr. Herbst to only those items requested or authorized by him. This was intended as a means of keeping Mr. Herbst out of the crossfire of this contentious litigation, and focused on the matter at hand — the reunification of Defendant with the children. While the Defendant did provide unrequested and unauthorized submissions to Mr. Herbst, the Court is not able to determine if this ultimately had any influence on his bottom-line conclusion.  Thus the need to subpoena these correspondences is germane.   Accordingly,  Plaintiff's request to subpoena these records is granted[.]

540.   Judge Katz did not specify what was meant by "his bottom-line conclusion" but that appears to be the decision by Mr. Herbst to cancel his involvement.

541.   The above explanation falls short of the justification needed for the state to intrude upon psychotherapist-patient communications.

542.   The Supreme Court has long recognized that the zone of privacy that is part of the constitution protects "the individual interest in avoiding disclosure of personal matters." Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

543.   Medical records contain highly personal and confidential information. The Fourteenth Amendment's due process clause protects individuals from arbitrary intrusions into their medical records by the State.   Hancock v. County of Rensselaer, 882 F.3d 58, 65–66 (2d Cir. 2018).

544.   An interest in medical privacy derives not just from a desire to keep one's

medical conditions to oneself but also from the collectively enjoyed benefit of being able to expect confidentiality from those we depend on to care for the most intimate aspects of our lives.

545.   There can be no question that medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection.   U.S. v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir. 1980).

546.   Psychotherapist-patient communications are among the personal areas protected by the right of privacy Borucki v. Ryan, 827 F.2d 836, 846 (1st Cir. 1987) (citing Caesar v. Mountanos, 542 F.2d 1064, 1067 & n. 9 (9th Cir.1976).

547.   As the D.C. Circuit has explained in Taylor v. United States, 222 F.2d 398, 401 (D.C. Cir. 1955) (quoting Gutmacher & Weihofen, Psychiatry and the Law 272 (1952)):

> Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him. "The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. … It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand."

548.   Of course, the right to privacy is not absolute, but when the government seek sot intrude upon psychotherapist-patient communications it must establish an extremely important state interest—that has not been established here.

549.   The primary reason for the Judge Katz ordering production of confidential communications is that he was upset that Malhan may have not followed paragraph 15 of the July 19, 2019 Order stated

> The parties shall limit their email, telephone and facsimile

> communications with Peter Herbst to only communication requested
> or authorized by him, or for scheduling purposes as set forth herein.
> At no time shall the parties attempt to engage Mr. Herbst in the
> adversarial divorce process.

550.   As argued above, this Order never should have been entered as it placed significant restrictions on what Malhan could discuss, but then having entered this improper Order Defendant Judge Katz now uses it as pretext for revealing confidential communications.

551.   Mr. Herbst's letter to the court mentioned:

> Mr. Malhan provided me with several documents and psychological
> evaluations, some of which I requested in hopes of obtaining a
> broader understanding of this family. …
> On September 30, after I refused Mr. Malhan's request for a third
> session, Mr. Malhan emailed me 65 paragraphs attacking the family
> court system, Ms. Myronova, her mother, grandmother and boyfriend,
> as well as other parties whom Ms. Myronova was able to recruit.

552.   Defendant Judge Katz apparently believes that the 65 paragraph email went beyond what Mr. Herbst "requested in hopes of obtaining a broader understanding of this family" but this could not be determined without getting into more specifically what documents Mr. Herbst requested, which would indicate quite clearly the issues that were being discussed.

553.   Yet again Judge Katz appears to believe that Malhan may have disregarded his order that: "At no time shall the parties attempt to engage Mr. Herbst in the adversarial divorce process," however, Mr. Herbst's letter states that Myronova appears to violated this:

> Ms. Myronova described the circumstances under which she and Mr.
> Malhan met and married which differed from Mr. Mulhan's [sic]
> version.   … She said the marriage became "'toxic" after four
> incidents , one of which involved Mr. Mulhan's [sic] business and an
> audit by the U.S. Department of Labor.

554.   Defendant Judge Katz appears unconcerned that Myronova violated this

order, and once again it is Gag Order that is only applied to one side.

555.   Of course, "At no time shall the parties attempt to engage Mr. Herbst in the adversarial divorce process," is ambiguous enough that almost anything could be regarded as violating this, so again, the only way to examine if this provision was violated would be do have Herbst or Malhan testify about the specifics of the conversation or have those specifics discussed in documents such as the emails.

556.   Peter Herbst is no longer a therapist, nonetheless, the breach of the psychotherapist-patient communications privilege has widespread implications, as Malhan has already informed the court that he cannot trust that anything he tells a therapist will be kept confidential.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

a) Under the Declaratory Judgment Act, declare that the gag orders are unconstitutional under the First and Fourteenth Amendments and the Commerce Clause of the United States Constitution, and are therefore invalid and unenforceable;

b) Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

c) Award Plaintiff other and further relief as the Court deems proper.

COUNT EIGHT

INJUNCTIVE RELIEF AGAINST ENFORCEMENT OF ORDER REQUIRING PRODUCTION OF THERAPIST RELATED COMMUNICATIONS

557.   The above paragraphs are incorporated herein by reference.

558.   Declaratory relief alone appears to be inadequate to remedy the constitutional violations at issue here.

559.   An immediate injunction against the enforcement of the policy of requiring

83

therapists to turn over patient records is necessary to prevent irremediable harm and protect fundamental rights.

Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

      a.      Preliminarily and permanently enjoin Judge Katz and those persons in concert or participation with them from ordering production of any medical records of Malhan.

      b.      Award Plaintiff reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

      c.      Award Plaintiff other and further relief as the Court deems proper.

Respectfully Submitted,

Paul A. Clark, Esquire (PC4900)
10 Huron Ave, #1M
Jersey City, NJ 07306
(202) 368 5435

VERIFICATION

1. I am plaintiff in the above action and have personal knowledge of the facts asserted herein as they pertain to me.
2. The above complaint is true and accurate to the best of my knowledge.

I certify that the foregoing statements are true. I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

Surender Malhan

ALINA MYRONOVA,

Plaintiff,

vs.

SURENDER MALHAN,

Defendant,

vs.

VIKTORIYA MYRONOVA,

Third Party Defendant.

JUN 18 2015

DONALD A. KESSLER, J.S.C.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, FAMILY
PART
ESSEX COUNTY

DOCKET NO.: FM-07-1952-14

**ORDER**

**THIS MATTER** having been brought before this Court by Adam Shefki, Esq. attorney for Plaintiff, on a Return of Order to Show Cause, and upon proper notice to Paul Clark, Esq., attorney for Defendant, for the reasons stated on the record, and for good cause shown,

It is on this **18th** day of **June 2015** hereby **ORDERED**:

1.  All parties are hereby restrained and enjoined from speaking with, appearing for an interview, or otherwise discussing any custody information to any reporters, journalists, newscasters or other news media employees or from posting any blogs or information not previously posted or disseminated relating to the children or any custody issue in this case pending a further hearing. Judge Sivilli's Gag Orders dated April 4, 2014 and May 1, 2014 are hereby vacated except as set forth above.

2.  Plaintiff shall have parenting time consistent with the May 29, 2015 order as follows: Ms. Myronova may resume parenting time with the children at her apartment effective immediately on the condition that Mr. Rothstein shall not be within 4 blocks of the residence and shall not have any physical contact with the children during her

Exhibit 1 to Complaint

parenting time pending further Order of the Court. Further, if Ms. Myronova sees Mr. Rothstein publicly while the children are in her presence she shall walk the other way. Mr. Rothstein shall have no contact with the children by telephone, in person or otherwise in any form pending further Order of the Court.

3. During each parties' parenting time the parties shall provide appropriate supervision of the children based on the respective ages of the children.

4. The parties shall follow the attached summer parenting time schedule as consented to in Court on June 18, 2015.

5. Defendant shall reinstate Plaintiff's health insurance which includes medical and dental insurance pursuant to Rule 5:4-2(f) within 7 days from the date of this Order.

6. REDACTED

7.

8. The Court shall reserve on the issue of counseling pending Dr. Singer's report.

9. The Court shall reserve on the issue of attorneys' fees and costs to be addressed after the receipt of Dr. Singer's report.

10. The Court shall reserve on the issue of termination of spousal support pending final hearing.

11. Alimony shall be subject to a Mallamo v. Mallamo, 280, N.J. Super. 8 (App. Div. 1995) adjustment at the time of final hearing.

Exhibit 1 to Complaint

12. The Court does not have sufficient information or documentation to rule on the cost of living adjustment for child support.

HON. DONALD A. KESSLER, J.S.C.

Exhibit 1 to Complaint



FILED

MAY - 1

Nancy Civil, J.S.C.

| | SUPERIOR COURT OF NEW JERSEY |
|---|---|
| **Alina Myronova** | CHANCERY DIVISION |
| | FAMILY PART |
| Plaintiff, | COUNTY OF ESSEX |

v.

Docket No. FM-07-1952-14
Civil Action

**Surrender Malhan**

AMENDED ORDER

Defendant/Third Party Plaintiff,

v.

**Viktoriya Myronova**

Third Party Defendant.

**THIS MATTER** having been opened by the Court *sua sponte* based upon its review of its April 4, 2014 Order in conjunction with the April 7 Notice of Emergency Motion for Stay filed by Thomas C. Cifelli, Esq., attorneys for defendant and third party plaintiff Surrender Malhan, and the Court having reviewed the April 4, 2014 Order, and for good cause having been shown:

It is on this 1st day of May, 2014 that the following Paragraphs of the April 4, 2014 Order are hereby amended *nunc pro tunc* to April 4, 2014:

6. All parties are hereby enjoined and restrained without prejudice from speaking with, appearing for an interview, or otherwise discussing, the parties' marriage, their pending divorce, the within litigation, or the parties' children or making any derogatory or negative statements about the other parties to any reporters, journalists, newscasters, or other agents/employees of newspapers or other media outlets on the grounds that it is not

Exhibit 2 to Complaint

in the best interest of the children to have the parties' divorce litigation discussed in a public forum or to have public disparaging statements made about one party by the other party.

7. Any portions of Defendant's blog that addresses issues pertaining to this divorce litigation, Plaintiff, or Third Party Defendant shall be removed immediately. Defendant is prohibited without prejudice from publishing in the future anything to the blog pertaining to this divorce litigation or any negative or disparaging statements about plaintiff or third party defendant.

8. Both parties are hereby prohibited without prejudice from discussing or commenting about the within litigation or making any negative or disparaging statements about the plaintiff or third party defendant on any form of social media including without limitation, Facebook, Twitter, blogs, Instagram, and Pinterest on the grounds that it is not in the best interest of the children to have the parties' divorce litigation discussed in a public forum or to have negative or disparaging statements made about by one party about the other party publicized or disseminated.

**ORAL DECISION PLACED ON THE RECORD ON MAY 1, 2014.**

**AND IT IS HEREBY ORDERED that a copy of this Order shall be served upon all interested parties within seven (7) days from the date herein.**

_____

HON. NANCY SIVILLI, J.S.C.

Exhibit 2 to Complaint

ORDER PREPARED BY THE COURT

| | |
|---|---|
| ALINA MYRONOVA, | SUPERIOR COURT OF NEW JERSEY |
|     Plaintiff, | CHANCERY DIVISION: ESSEX COUNTY |
| | FAMILY PART |
|     v. | |
| SURENDER MALHAN, | |
|     Defendant/Third Party Plaintiff, | |
|     v. | DOCKET NO. FM-07-1952-14 |
| VIKTORIYA MYRONOVA, | |
|     Third Party Defendant, | |
|     And | **ORDER** |
| SPACEAGE CONSULTING CORP., | |
|     Plaintiff, | |
|     v. | |
| ALINA MYRONOVA AND VIKTORIYA MYRONOVA, | |
|     Defendants. | |



**THIS MATTER** having been opened to the Court by way of applications filed by Pashman Stein Walder Hayden, P.C. (Tracy Julian, Esq., and Linda Torosian, Esq. appearing), on December 6, 2019 and December 23, 2019, and by Cross-Motions dated January 3, 2020 and January 9, 2020, filed by Paul Clark, Esq., attorney for Defendant, and considering oral arguments of counsel made on January 16, 2020, and good cause appearing

**IT IS** on this _27th_ day of **January, 2020**;

**ORDERED:**

Exhibit 3 to Complaint

1.  Defendant's fifth and sixth recusal motions are hereby denied for the reasons set forth in the accompanying Opinion;

2.  Defendant is in violation of the June 18, 2015 Gag Order for the reasons stated in the accompanying Opinion. Based on the fact that prior adjudications and a caution of sanctions has not deterred Defendant, he is hereby sanctioned $1,000 for the December 24 and 25, 2019 posts. Each subsequent post will result in the sanction increasing $1,000 for each violative post;

3.  Defendant's third application to vacate the Gag Order is hereby denied for the reasons stated in the accompanying Opinion;

4.  Defendant's request in aid of litigant's rights is hereby denied for the reasons stated in the accompanying Opinion, as Plaintiff has not violated the March 26, 2019 Order;

5.  Plaintiff's application finding that Defendant has violated litigant's rights by attempting to pick up the children from the school on November 27, 2019 in contravention of the Parenting Order (February 15, 2018) is hereby granted for the reasons stated in the accompanying Opinion;

6.  Defendant shall be psychologically evaluated by Dr. Montgomery for the reasons stated in the accompanying Opinion. Defendant is directed to contact Dr. Montgomery forthwith;

7.  Defendant is hereby precluded from contacting high schools that the parties' son, E.M., is applying to; however, neither party may select a high school for E.M. to attend without the other's consent or Court Order, for the reasons stated in the accompanying Opinion;

Exhibit 3 to Complaint

8.  Defendant is hereby precluded from visiting, contacting or corresponding with NorthStar and its therapist(s) unless and until specifically requested by NorthStar for the reasons stated in the accompanying Opinion.  The parties shall limit their email, telephone and facsimile communications with NorthStar to only communications requested or authorized by them or their therapists, or for scheduling purposes.  At no time shall the parties attempt to engage NorthStar or their therapists in the adversarial divorce process;

9.  Defendant's request to un-admit Joint Exhibits, J-650 to -656 and J-658 to -661, is hereby denied for the reasons stated in the accompanying Opinion;

10. Plaintiff's request to replenish the Litigation Fund by selling additional units is hereby denied for the reasons stated in the accompanying Opinion;

11. Defendant's request to find that Plaintiff interfered with Defendant's supervised visitation is hereby denied for the reasons stated in the accompanying Opinion;

12. Defendant's request that Plaintiff's counsel(s) produce documents showing receipt of the NCC funds is hereby denied for the reasons stated in the accompanying Opinion;

13. Plaintiff shall be required to produce certain photographs for inspection at Plaintiff's counsel's office, within the parameters set forth in the accompanying Opinion;

14. Defendant shall produce his communications with Mr. Herbst as set forth in the November 15, 2019 Order.

15. All other relief is denied for the reasons set forth in the accompanying Opinion.

_____
HON. DAVID B. KATZ, P.J.F.P.

Page **3** of **3**

Exhibit 3 to Complaint

ORDER PREPARED BY THE COURT

| | |
|---|---|
| ALINA MYRONOVA, | : |
|     Plaintiff, | : |
|     v. | : |
| SURENDER MALHAN, | : |
|     Defendant/Third Party Plaintiff, | : |
|     v. | : |
| VIKTORIYA MYRONOVA, | : |
|     Third Party Defendant, | : |
|     And | : |
| SPACEAGE CONSULTING CORP., | : |
|     Plaintiff, | : |
|     v. | : |
| ALINA MYRONOVA AND VIKTORIYA MYRONOVA, | : |
|     Defendants. | : |

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: ESSEX COUNTY
FAMILY PART

DOCKET NO. FM-07-1952-14

**ORDER**

FILED

JAN 3 0 2020

**THIS MATTER** having been opened to the Court during the ongoing trial by Pashman Stein Walder Hayden, P.C. (Tracy Julian, Esq., and Linda Torosian, Esq., appearing), and with notice to Paul Clark, Esq., attorney for Defendant, Surender Malhan, and the Court having heard the parties on January 30, 2020, and having set forth its reasons on the record, and good cause appearing;

    **IT IS** on this 30th day of January 2020, **ORDERED** as follows:

Exhibit 4 to Complaint

1.      Plaintiff, through counsel, shall provide the Court the records and financial information relative to the high schools from which the parties' son, ███████████, has received offers of acceptance and financial assistance, for *in camera* review immediately.

2.      The Court will hold all of the documents received pursuant to Paragraph 1 in a separate file, with the expectation that said documents will be released to Defendant on a future date to be determined.

3.      Defendant, or anyone on his behalf, is hereby precluded and enjoined from contacting, corresponding with, and/or communicating with any private high school in New Jersey and/or any of their agents or employees, for fifteen (15) days from the date of this Order. This includes contact, correspondence, and/or communication with respect to █████, and whether he has applied to or been accepted by a particular high school. The parties may submit written submissions within ten (10) days hereof with respect to the length of time that this prohibition remains in effect.

4.      Any violation of this Order in the next fifteen (15) days will result in sanctions in the amount of $10,000 for the first violation, and an additional $10,000 for each subsequent violation (e.g., first violation: $10,000; second violation: $20,000; third violation: $30,000).  Any attempt to contact, correspond with, or communicate with any private high school in New Jersey and/or any of their agents or employees with respect to █████, within the next fifteen (15) days, will be deemed a violation warranting sanction.

3:30 p.m.

_____
Hon. David B. Katz, P.J.F.P.

Exhibit 4 to Complaint

**ORDER PRPARED BY THE COURT**

ALINA MYRONOVA,                                    :

     Plaintiff,                                   :     SUPERIOR COURT OF NEW JERSEY
                                                        CHANCERY DIVISION: ESSEX COUNTY
     v.                                            :     FAMILY PART
                                                   :
SURENDER MALHAN,                                   :

     Defendant/Third Party Plaintiff,             :

     v.                                            :     DOCKET NO. FM-07-1952-14
                                                   :
VIKTORIYA MYRONOVA,                               :

     Third Party Defendant,                       :

     And                                          :     **ORDER**
                                                   :
SPACEAGE CONSULTING CORP.,                         :

     Plaintiff,                                   :

     v.                                            :

ALINA MYRONOVA AND
VIKTORIYA MYRONOVA,                               :

     Defendants.                                  :

THIS MATTER having been opened to the Court in furtherance of the Court's Order of

January 30, 2020, entered at 3:30 p.m., to determine the duration of the restraints imposed therein,

and the parties having been afforded an opportunity to submit their position, and the Court having

issued an Opinion accompanying this Oder which sets forth its reasons, and good cause appearing,

**IT IS** on this ___11th___ day of ___February___, 2020;

**ORDERED:**

1.     That the restraints set forth in Paragraph 3 of the Court's Order entered January

30, 2002 at 3:30 p.m., to wit:

Exhibit 5 to Complaint

Defendant, or anyone on his behalf, is hereby precluded and enjoined from contacting, corresponding with, and/or communicating with any private high school in New Jersey and/or any of their agents or employees.  This includes contact, correspondence, and/or communication with respect to ████ and whether he has applied to or been accepted by a particular high school

shall remain in full force and effect pending further Order after the Court receives and reviews Dr.

Montgomery's forthcoming evaluation of Defendant.

HON. DAVID B. KATZ, P.J.F.P.